FLIGHT ENGINEERS INTERNATION-
AL ASSOCIATION, EAL CHAPTER,
AFL–CIO, Plaintiff,
v.
EASTERN AIR LINES, INC., Defendant.

United States District Court
S. D. New York.
Aug. 10, 1962.

3. But see, United States v. On Lee, 201 F.2d 722 (2d Cir.1953), (dissenting opinion).

---

Patt & Heimowitz, New York City, for plaintiff, William B. Peer, of Zimring, Gromfine & Sternstein, Washington, D. C., of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant, Burton A. Zorn and Marvin E. Frankel, New York City, of counsel.

FEINBERG, District Judge.

This is a motion for a preliminary injunction by plaintiff union, Flight Engineers International Association, against defendant, Eastern Air Lines, Inc. It grows out of a tangled labor dispute involving effects of technological change, featherbedding and rival union jurisdiction. Both parties, at different stages of the lengthy negotiations, have exhibited something less than an acute awareness of the needs of the public. For the reasons set forth below, the injunction is denied. However, such denial of relief sought by the Flight Engineers reflects no approval of Eastern's action in refusing to accept the most recent settlement proposal of Secretary of Labor Goldberg, as set forth in the papers before me.

I

The facts as they appear from the verified complaint and Eastern's detailed affidavit in opposition [1] are the following. The Flight Engineers and Eastern entered into a collective bargaining agreement on December 31, 1958, to be effective the next day. This agreement was to continue in force until April 1, 1960, renewable thereafter on a yearly basis unless notice of a desire to change the agreement was served by either party on the other prior to April 1 of any year, as required by Section 6 of the Railway Labor Act, 45 U.S.C.A. § 156 (the "Act").[2]

On February 8, 1960, the Flight Engineers served upon Eastern such a "section 6" notice.[3] Eastern responded by serving a similar notice four days later.[4] Both notices were couched in general terms, without articulation of the specific changes in the agreement desired by either party. However, in April 1960, the parties did exchange detailed proposals of changes desired in the agreement. After extensive negotiations based on these proposals failed to

---

1. The Flight Engineers submitted no affidavit in support of their motion.

2. "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions * * *." Railway Labor Act, § 6, as amended, 45 U.S. C.A. § 156. Such written notices of intended change are commonly referred to as "section 6 notices" in the transportation industries.

3. The union's notice read, in substance: "Notice is hereby given * * * of the desire of the [union] to make certain changes in and additions to [the collective bargaining agreement] as of April 1, 1960."

4. Eastern's notice read, in substance: "This is to advise * * * that the company also desires to make certain changes in our agreements with the Association."

yield a settlement, the parties, in July 1960, resorted to the mediation services of the National Mediation Board, as provided for under the Act.[5] The case was docketed by the National Mediation Board in July, and the Board proceeded to mediate the dispute.

In the ensuing year, issues were injected into the negotiations which have since become the crucial ones and which were not included in the original "section 6" notices served in February 1960. Prior to that time, Eastern had signed an agreement with another union, the Air Line Pilots Association, which included provision for a cockpit crew of three pilots on jet planes. The government regulations applicable to Eastern's operations require that jet aircraft and four-engine propeller aircraft carry a basic cockpit crew of three airmen, two of whom must be qualified air pilots and one of whom must possess a Flight Engineer's Certificate issued by the Federal Aviation Agency ("FAA"). The contract between Eastern and the Flight Engineers provided that the latter would hold an FAA Airframe and Powerplant License ("A&P license"—sometimes called an "A&E license," the type required for ground mechanics) in addition to the FAA Flight Engineer's Certificate. The result of these contracts was that Eastern, along with other airlines, carried a basic cockpit crew of four men, one more than required by FAA regulations or desired by Eastern. Three of the four were pilots represented by the Air Line Pilots Association, and the other was a flight engineer, holding an A&P license, represented by the Flight Engineers.

On February 6, 1961, the National Mediation Board, in another case, held that pilots and flight engineers employed by United Air Lines constituted a single craft or class of employees for the

purpose of collective bargaining under Section 2, Ninth of the Act, 45 U.S.C.A. § 152, Ninth. On February 17, 1961, the Flight Engineers struck Eastern as well as several other airlines, seriously disrupting the operation of the nation's air transportation system. The strike ended shortly thereafter when, upon Secretary of Labor Goldberg's recommendation, President Kennedy established the so-called Feinsinger Commission to make recommendations with respect to a settlement of the parties' dispute over the crew complement problem. Both Eastern and the Flight Engineers (as well as the Air Line Pilots Association and other airlines) participated in the hearings before the Feinsinger Commission. The Commission issued a preliminary report on May 24, 1961, which stated, *inter alia,* that both the Flight Engineers and the Air Line Pilots Association agreed that a jet crew of three men was adequate and that:

"The most obvious solution to this problem is merger or some form of consolidation [of the two unions]. In the considered opinion of the Commission, neither peace nor safety on the airlines will be fully assured as long as there are two unions in the cockpit." [6]

Failing to resolve the crew complement issue in a manner acceptable to all parties, the Feinsinger Commission made final recommendations to the President on October 17, 1961, for a solution to the issues before it.[7] From that time on, negotiations between Eastern and the Flight Engineers were concerned not only with the issues originally raised by the "section 6" notices but also with the crew complement issue. Negotiations on the latter were carried on both under the auspices of the National Mediation Board at that agency's request,[8] and also with the assistance of

---

5. Railway Labor Act § 5, First, as amended, 45 U.S.C.A. § 155, First.

6. Feinsinger Comm'n, Report to the President, at 42 (1961).

7. Feinsinger Comm'n, Report Supplementing a Report to the President (1961).

8. The Board, in September 1961, had notified the parties that the union had declined to arbitrate the question before it and, accordingly, the Board was terminating its services under the Act. It is not clear from the record whether

Professor Feinsinger and Undersecretary of Labor Willard Wirtz. These negotiations continued intermittently until February 21, 1962. On that date, the Flight Engineers served a written strike notice on Eastern. The next day, President Kennedy, pursuant to Section 10 of the Act, 45 U.S.C.A. § 160, appointed Emergency Board No. 144 (the "Emergency Board") to "investigate certain unadjusted disputes" between Eastern and the Flight Engineers. On March 26, 1962, the Emergency Board convened hearings on the matter and filed its report on May 1, 1962.[9] Despite the Flight Engineers' opposition, the Emergency Board concluded that the issue of whether the recommendations of the Feinsinger Commission should be implemented had been submitted to it, and that those recommendations should be implemented by the Emergency Board since they were thought to be a "critical part of this dispute [between the parties]."[10]

Further negotiations between Eastern and the Flight Engineers failed to resolve the issues before them, and in late May the Flight Engineers served a strike notice effective at any time on or after June 1, 1962. On this date, thirty days after the Emergency Board report was issued to the President, the union was first legally free to strike under the Act, 45 U.S.C.A. § 160. In June, the parties met fruitlessly, and the Flight Engineers told Eastern that any new agreement had to provide that all men hired by Eastern in the future as flight engineers must have the A&P license, a position contrary to the Feinsinger and Emergency Board recommendations. Both parties, and the other airlines affected by the crew complement issue, were exhorted by Secretary Goldberg and President Kennedy in June to arbitrate all unresolved issues. On June 14, 1962, Eastern agreed to arbitrate but the Flight Engineers refused. On the same day, President Kennedy, at his press conference, strongly urged the Flight Engineers "to either submit this case to arbitration or agree with the carriers on some other means of settling this dispute without any interruption of operations."

Thereafter, the president of the Flight Engineers issued a press release which apparently "offered" to submit to arbitration unresolved economic issues outstanding between Eastern and the union, although it expressly excluded submission of the crew complement issues. Further negotiations between the parties broke down shortly thereafter, and on June 23, 1962, the Flight Engineers struck Eastern. The day before, the National Mediation Board made a proffer of mediation to the union, which was rejected.

On June 23, 1962, the day the strike commenced, President Kennedy stated, among other things, that a sensible solution was open to both parties, and he cautioned the Flight Engineers that "to persist in the strike course would be the height of irresponsibility on their part." On the same day, George Meany, president of AFL–CIO, made an effort to avoid the strike and urged the union to resume negotiations. On June 25, 1962, at the request of the government, Eastern and the Flight Engineers met in Washington. A few days before, a strike between Trans World Airlines ("TWA") and the TWA chapter of the Flight Engineers had been settled. At the meetings in Washington, Eastern agreed to settle all unresolved issues, including the crew complement dispute, on the basis of the TWA settlement. The Flight Engineers rejected the offer and

Eastern also declined to arbitrate at that time. However, after the final recommendations of the Feinsinger Commission, the Board requested the Flight Engineers, Eastern and other airlines to meet with it on November 6, 1961, to seek "an amicable adjustment of unre-solved issues including but not limited to the recommendations of the President's Commission on the airlines controversy."

9. U.S. Emergency Board No. 144, Report to the President (1962).

10. Id. at 6.

stated, in effect, that they would never give up the requirement of an A&P license.

On July 17, 1962, Eastern sent a letter to the president of the Eastern chapter of the Flight Engineers setting forth the severe economic losses it was suffering as a result of the strike. After stating that changed circumstances brought about by the strike necessitated modifications in offers previously made by Eastern to the union, Eastern withdrew its previous offers, and made modified proposals on the basis of which it would sign an agreement if the Flight Engineers accepted them in writing on or before July 18, 1962. The letter also stated that if acceptance were not received by 6 P.M. on July 18, Eastern would offer the same terms and conditions to all of the flight engineers; those who did not return to work on or before July 24, 1962 and agree to receive pilot-engineer training as recommended by the Feinsinger Commission would be permanently replaced as rapidly as possible. On July 19, 1962, Eastern called 80 jet co-pilots into immediate training to complete their qualifications for a Flight Engineer's Certificate. It also advised all Eastern flight engineers that anyone reporting to work on or before July 24, 1962 would not lose his job to any copilot receiving such training.

From July 17 to July 19, Eastern and the Flight Engineers met with Undersecretary Wirtz and Professor Feinsinger to consider the crew complement and other unresolved issues. On July 23, 1962, at the request of Secretary Goldberg, further talks were held. At their conclusion, Secretary Goldberg proposed a method for settling the dispute. According to the record before me, the Secretary recommended that the parties agree to arbitrate all unresolved economic issues. He did not recommend that the crew complement issue be submitted to arbitration, but proposed that "upon receipt of the arbitration award of the unresolved economic issues" the parties "will complete agreement regarding the crew complement issue within the framework of the heretofore agreed-upon basic principles and subject to the concurrence of the Eastern Airlines Pilots." The Secretary stated that he and other governmental officials and agencies would assist the parties in reaching agreement on the crew complement issue, and that "any crew complement issue not resolved is to be finally settled by such procedures as they shall prescribe." Finally, the Secretary recommended immediate cancellation of the Flight Engineers' strike and resumption of operations by Eastern. The same day, Eastern informed the Secretary that it could not accept the proposal, principally on the ground that the solution to the crew complement issue was "still one that will not immediately include or definitely bind the pilots." It further stated that after strikes by the Flight Engineers over this very issue, "we cannot accept the solution that amounts to a 'truce' * * * with no assurance of pilot acquiescence."

The next day, the union accepted Secretary Goldberg's recommendation to submit the unresolved economic issues to arbitration. With regard to the crucial crew complement issue, the Flight Engineers proposed that the parties immediately "write an agreement * * * regarding the crew complement issues within the framework of the already agreed-upon basic issues." The Flight Engineers offered to return to work immediately upon conclusion of such an agreement.

On July 24, 1962, Secretary Goldberg asked Eastern to reconsider its action. Since then, further meetings have been held under the auspices of the Secretary of Labor, but have not produced any resolution of the issues of the basic dispute.

On July 23, 1962, Eastern resumed operations on an extremely limited basis. The strike has forced an almost complete shutdown of Eastern's operations, causing it to lose an estimated $1 million a day in revenue. As a result of the strike, Eastern has been forced to furlough approximately 17,000 employees,

who have suffered a loss of $12 million a month in wages and benefits. The strike has resulted in a serious reduction of the airline service received by the 115 communities normally served by Eastern, and has disrupted the travel plans of a large portion of the public.

## II

█ The Railway Labor Act, 45 U. S.C.A. §§ 151–163, 181–188, provides detailed procedures for the settlement of labor disputes arising in industries covered by the Act. The procedures differ, depending upon whether "minor" or "major" disputes are involved. The former involve the interpretation and application of existing collective bargaining agreements; the latter concern the formation of terms and conditions of employment to be included in a new collective bargaining agreement governing the relationship between the parties. See, e. g., Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723–24, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); Pan American World Airways, Inc. v. Flight Eng'rs Ass'n, 2 Cir., 306 F.2d 840. Since the issues in this case amount to a "major dispute," attention need only be given here to the Act's procedures for resolving such disagreements. These have been ably summarized by Judge Bryan in American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 784 (S.D.N.Y.1958):

> "If either carrier or employees desire to make any change in the status quo with respect to conditions of employment, either under an existing collective bargaining agreement or in its absence, they must give 'at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions', § 6.

> "Thereafter it is the duty of both parties under the mandate of Section 2 to confer and the Act directs that the time and place for the beginning of conference '*shall* be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice'. (Emphasis supplied.) § 6.

> "If the conferences fail either party may invoke the services of the Mediation Board which 'shall promptly put itself in communication with the parties' and 'shall use its best efforts, by mediation, to bring them to agreement'. If these efforts are unsuccessful the Board 'as its final required action' (except as to the request for a Presidential Emergency Board) '*shall* at once endeavor * * * to induce the parties to submit their controversy to arbitration'. (Emphasis supplied.) § 5, First. If both parties agree arbitration proceeds under § 7 and the resulting award is final and binding on the parties. If arbitration is refused, however, the Board '*shall*' notify the parties that its mediatory efforts have failed and 'for thirty days thereafter, unless in the intervening period the parties agree to arbitration, or an emergency board shall be created under Section 10 of this Act, no change shall be made in the rates of pay, rules or working conditions or established practices in effect prior to the time the dispute arose'. (Emphasis supplied.) § 5, First.

> "Finally, after being notified by the Mediation Board that a dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation', the President may create a Board which 'shall investigate promptly the facts as to the dispute and make a report thereon to the President within thirty days from the date of its creation'. After the creation of the Board, and for thirty days after it has reported to the President 'no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose'. § 10."

■■ It should be noted that at no stage of the proceedings under the Act are the parties compelled to settle the dispute unless both agree to submit the issues to binding arbitration. See Elgin, J. & E. Ry. v. Burley, supra, at 325 U.S. 722–28, 65 S.Ct. 1282. See generally Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 385 (1960).

> "For [the settlement of major disputes] * * * the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." [11]

The carrier, on the other hand, can effect no changes in the terms and conditions of employment pertaining to the dispute until the procedures of the Act are exhausted. Nor may either party resort to the use of economic weapons, i. e., "self-help," until the proceedings provided by the Act for major disputes are at an end.[12]

The union contends that the actions of Eastern, as outlined in its letter to it on July 17, 1962, and as effectuated on July 24 and thereafter, violated various sections of the Act. The union argues (1) Eastern has placed into effect changes in terms and conditions of employment without having first served a notice of intended change as required by Section 6 and Section 2, Seventh of the Act; (2) Eastern has bargained directly with flight engineers in violation of Section 2, Fourth and Section 2, Ninth of the Act; and (3) Eastern has executed agreements with individual flight engineers with the intended and ultimate effect of coercing them and otherwise interfering with the selection of their bargaining representative in violation of Section 2, Third and Section 2, Fourth of the Act.

With regard to the first contention, the union claims that since the crew complement and A&P license issues were not raised in Eastern's original "section 6" notice, no unilateral act on the part of the carrier changing the status quo could be legally instituted because the compulsory mediation procedures of the Act had not been exhausted with respect to those issues.

In the recent case of Pan American World Airways, Inc. v. Flight Eng'rs Ass'n, supra, the Court of Appeals dissolved an injunction obtained by Pan American in the District Court against the Flight Engineers' strike of the carrier. Pan American apparently contended that the strike was illegal either because no "section 6" notice was served by either party with reference to the crew complement problem and the mediation procedures of the Act had not been complied with, or, in the alternative, that Pan American's "acceptance" of the recommendations of the Feinsinger Commission on the crew complement issue, some 16 or 17 months after the original "section 6" notices, constituted a new "section 6" notice on that issue, which set in motion the procedures of the Act not theretofore exhausted prior to the strike. The Court of Appeals, in a 2–1 decision, rejected the contention that "one of the parties to the procedures under the Railway Labor Act can, after

11. Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282 (1945).

12. See Butte, A. & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54, 58 (9 Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 789 (S.D.N.Y. 1958).

190

those procedures are once exhausted, set them in motion for a second time by the service of a Section 6 notice raising new issues." Pan American World Airways, Inc. v. Flight Eng'rs Ass'n, supra, 306 F.2d at 847. Further, the logical extension of such a conclusion would mean that "each new dispute on which the parties served appropriate 'openers' would set in motion the machinery of the Railway Labor Act all over again with respect to a dispute in which the procedures of the Act had already been fully exhausted. Thus the right of the Union or the employer to use the economic pressures of strike or lockout which are forbidden only during a period when the parties have not fully performed their duties and obligations under the Act, could be postponed indefinitely." American Airlines, Inc. v. Air Line Pilots Ass'n, supra 169 F. Supp. at 797.

■ Therefore, under Pan American, injection of the crew complement and related issues by Eastern after the "section 6" notices had been served could not, by starting the Act's processes all over again, prevent the Flight Engineers from striking. But having raised these issues, and the union having struck, is Eastern foreclosed, as the union contends, from changing the terms and conditions. of employment? Under the circumstances of this case, I think not. This is not a situation in which the employer raised the crew complement issue for the first time after the union went on strike, where different considerations might be involved. Rather, the employer here is in the same position as the employer was in Pan American, where no formal "section 6" notice was ever filed, but the employer "accepted" the recommendations of the Feinsinger Commission report and the issues were the subject of extended application of the Act's procedures. To allow a union but not an employer "self-help" in that situation is a possible but unattractive result, which stacks the deck heavily in favor of one of the parties to a labor dispute after a strike has started. I do not believe such a result is required by the Act.

■ The crucial question in this context is: have the parties negotiated with respect to those fundamental issues dividing them within the context of the "major dispute" proceedings under the Railway Labor Act? I find that they have, and an impasse has been reached as to them. While it is true that the crew complement and A&P license issues were not included in Eastern's original "section 6" notice, there is no doubt that these issues were the crucial elements of the dispute which divided the parties during the extensive bargaining since February 1961, when the Flight Engineers actually went out on strike because of these issues. On the record before me, it is clear that the primary cause of this labor dispute and the current strike was the crew complement problem and its related issues. Although there may have been a technical deficiency in the manner in which these issues were injected into the dispute, such technicalities cannot mask the fact that these issues have been a subject of negotiation since February 1961, and as to them, the processes of the Act have been exhausted. To allow either party to block resort to "self-help" after the exhaustion of the Act's procedures by relying on a technical omission from the original "openers" of issues fully discussed and negotiated would give precedence to form over substance. After protracted negotiation and mediation on these issues, an impasse was reached, and at that stage, it would appear that the purposes of the Act, which attempts "to avoid any interruption to commerce" and "to provide for the prompt and orderly settlement of all disputes" had been fulfilled. They could not have been implemented further by a subsequent service of a new "section 6" notice, even though such service might cure what may have been a technical omission to comply with the formalities of the Act. To require compliance with such formality would, under the circumstances of this case, only defer the possibilities of

settlement. See International Air Line Pilots Ass'n v. Southern Airways, Inc., 44 CCH Lab.Cas. ¶17,460 at 26,220 (M. D.Tenn.1962), appeal docketed, Nos. 15021–22, 6 Cir., May 17, 1962. Moreover, it may be that such formal technicalities were fulfilled here. From the Flight Engineers' original proposals of April 1, 1960, it appears that they may have "opened" the crew complement problem themselves.[13] If so, the alleged technical deficiency would disappear from the case.

Finally, it can be argued that, under the circumstances of this case, the union waived any technical deficiency of compliance with the Act's requirements ·with respect to these issues. While the Act does not, by its terms, specifically speak of waiver, the doctrine would appear applicable when justified by the facts. See Childers v. Brotherhood of R. R. Trainmen, 192 F.2d 956, 959 (8 Cir. 1951); International Air Line Pilots Ass'n v. Southern Airways, Inc., supra, at 26218–19. It would seem that the union's extensive participation in negotiation and mediation proceedings during which the crew complement and related issues were thoroughly discussed constituted a waiver of Eastern's failure to serve a "section 6" notice on those issues, since the union knew that no such "opener" had been served by Eastern.

## II.

Having decided affirmatively the question of whether Eastern could change conditions and terms of employment, the issues remain of whether, as the union charges, Eastern nonetheless improperly bargained directly with and coerced individual engineers.

If an employer and a bargaining representative reach a deadlock after exhausting the procedures established by the Act in an attempt to settle a "major dispute," "it is quite clear that the Act contemplates that further progress toward the determination of the controversy will be left entirely to the interplay of economic forces without governmental intervention. The parties are then free from all compulsion under the Act and may resort to 'self-help' * *." Pan American World Airways, Inc. v. Flight Eng'rs Ass'n, supra, 306 F.2d at 846. This rule does not appear to differ from the rule under the National Labor Relations Act ("NLRA") that in labor disputes classified as economic, resort to "self-help" is permissible when the parties' good faith bargaining reaches an impasse, see N. L. R. B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The economic pressure to which the employer or union may resort is, of course, not unlimited, and here the Flight Engineers claim that Eastern resorted to unlawful pressure.

On July 17, Mr. J. O. Jarrard, Vice-President for Industrial Relations of Eastern, wrote to Mr. Jack Robertson, president of the Eastern chapter of the Flight Engineers. After briefly summarizing the long history of the attempts that had been made to solve the problems of "job security, qualification and representation of flight engineers," he described the impact of the strike: losses to Eastern of over $25 million, temporary unemployment of nearly 18,000 Eastern employees, and great inconvenience to the public. Consequently, the letter continued, the strike had altered the parties' circumstances, and Eastern was "compelled to take affirmative and positive steps to resume operation immediately." Therefore, Eastern proposed to begin immediate transition from four-man to three-

---

13. The copy of the union's original proposals attached to its complaint includes, at page 16:
 "3. Mediation agreement on withdrawal of pilot qualification—renew without change.
 "4. A and E waiver—renew without change.

"5. On all straight jet aircraft, on all flights, on all routes or route segments a second Flight Engineer will be assigned and carried on as an operating crew member. Such Flight Engineer shall be subject to all provisions of this Flight Engineer working agreement."

man jet crews, with the third man to have the pilot training advocated by the Feinsinger Report. In place of the detailed solution to the crew complement issue suggested by the Report, Eastern simply offered to give the necessary pilot training to its flight engineers at its expense in the manner approved by the Report. Eastern also offered the flight engineers a 10.82% pay increase, apparently the increase it had proposed during the hearings before the Emergency Board[14] and recommended by the Board.[15] Eastern retreated from its apparent past willingness to grant both a limited retroactive pay increase and a prospective increase, effective on April 1, 1962.[16] Eastern further stated that it would be available to discuss its offer with the Flight Engineers for the balance of July 17 and July 18,[17] but that if the Flight Engineers rejected the offer, Eastern "[would] offer the same terms and conditions to all of the flight engineers individually." The offer was subject to the condition that only flight engineers who returned to work on or before July 24 would be given the appropriate pilot training at Eastern's expense. Strikers who did not return by that date would, "if re-employed by the Company, be restricted to service on propeller-driven aircraft and [would] not be given the training contemplated by the Feinsinger Report." Flight engineers who did not return to work "[would] be permanently replaced as rapidly as possible."

Thereafter, Eastern sent to each striking flight engineer a letter, dated July 18, signed by Mr. Malcolm MacIntyre, President of Eastern. Annexed to the letter was Mr. Jarrard's letter of the previous day to Mr. Robertson. Mr. MacIntyre reiterated that because of the impasse in negotiations and the great losses suffered by Eastern because of the strike, Eastern had to resume operations. Therefore, he stated, effective immediately, the "terms and conditions set forth on the attached letter of July 17, 1962 shall be applicable to all flight engineers [of Eastern]." In addition to instructing the strikers as to how and when any of them who wished to return to work could inform Eastern of their decision, Mr. MacIntyre stated that any engineer who did not elect to take jet pilot training would be restricted to propeller aircraft, and added, "Those who do not report by July 24th may be replaced and any who are re-employed thereafter will be restricted to propeller aircraft." On July 19, the strikers were informed by letter that to resume operations as quickly as possible, Eastern was calling 80 copilots into training as flight engineers. The copilots would be used as the third man in jet crews to the extent that such places were not filled by flight engineers who reported to work by July 24. The letter concluded that "these copilots will not take flight engineer jobs away from any present flight engineer who so reports." As of July 24, 1962, 53 flight engineers had accepted the offer of July 18, and received priority for the pilot-engineer's position in the three-man crew. The program of training 80 copilots as flight engineers was, as of the date of the hearing, well underway, and the cost of that program is estimated to be approximately $341,000.

The union argues that Eastern has attempted to bargain individually with flight engineers in violation of Section 2, Fourth and Section 2, Ninth of the Act, which require employers to bargain only with their employees' authorized representatives, and has coerced flight engineers in violation of Section 2, Third and Section 2, Fourth of the Act. The principal conduct of Eastern that might constitute individual bargaining consists of the company's letters of July

14. U.S. Emergency Board No. 144, Report to the President at 18 (1962).

15. Ibid.

16. Id. at 21.

17. Discussions were held on July 17, 18 and 19 by the parties with the aid of Undersecretary of Labor Wirtz and Professor Feinsinger.

18 and July 19 to the strikers, which, according to the record before me, are the only communications sent directly to them by the company. Eastern claims, and there is nothing in the record to the contrary, that it has negotiated only with the union and never with individual engineers. Accordingly, the Flight Engineers' entire argument on individual bargaining stands or falls primarily on Eastern's two letters to the strikers.

Eastern's letters both withdrew all previous offers to the strikers, and stated the terms upon which they could return to work. It does not appear that this conduct violated the Act. The terms relating to the crew complement issue upon which Eastern proposed to take back the strikers gave them less job protection than Eastern's previous offers. The cases under the NLRA that suggest a measure of Eastern's right to vary its offer indicate that Eastern's abandonment of some prior concessions under the circumstances of this case was not unlawful. See Great Falls Employers' Council, Inc., 123 N.L.R.B. 974, 982 (1959), enforcement denied on other grounds N.L.R.B. v. Great Falls Employers' Council, Inc., 277 F.2d 772 (9 Cir. 1960) ("Respondents bargained in good faith until an impasse developed on April 12, 1957, when the Union rejected Respondents' last amended offer and, on the following day, struck Buttrey, one member of the multiemployer unit. Thereafter, Respondents were relieved of any duty they may have been under to adhere to previously made bargaining concessions and were free to withdraw, as they did on April 15, 1957, their rejected 'final proposal' and to renounce the terms of the old, expired contract which had been continued in effect by mutual consent of both parties thereto.").[18] It is clear that Eastern's modification of its position neither created the deadlock in the parties' negotiations nor precipitated the strike. Eastern did not depart from its last, pre-strike offer until the strike was 25 days old. The cases decided under the NLRA and the apparent economic justification for Eastern's actions and absence of bad faith on its part compel the conclusion that Eastern's withdrawal of its last offer, linked with its new proposal, was not resort to unlawful "self-help."

Nor do I think unlawful Eastern's statement in its letters of the terms on which it invited the strikers to return to work. Initially communicated to the union on July 17, the new offer of July 18, when mailed to the strikers, amounted to no more than a unilateral statement of the terms on which the strikers could return to work if they wished. Plainly, "bargaining" with individuals was neither contemplated nor involved; there is no evidence that any resulted. Parenthetically, it should also be noted that the offer was in no way more advantageous to the flight engineers than Eastern's previous offers. Thus, the new offer was not the type of unilateral employer action taken with intent to weaken a union which, if taken in an economic dispute subject to the NLRA, would be deemed a violation of the duty to bargain in good faith. See May Dept. Stores Inc. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945); Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1423–24 (1958), and cases cited therein.

Finally, was Eastern entitled to notify the strikers in its letters that if they did not return by a specified date they would be replaced as rapidly as possible, and that copilots would be trained to replace them; and did Eastern engage in permissible "self-help" when it began training the replacements? Once again, the precedents under the NLRA suggest solutions under the Railway Labor Act. The unfortunate impasse situation is the same, regardless of the statute involved. International Air Line Pilots Ass'n v.

18. Cf. N. L. R. B. v. Hart Cotton Mills, Inc., 190 F.2d 964 (4 Cir. 1951) (withdrawal of concession not evidence of bad faith); Stoner Rubber Co., 123 N.L. R.B. 1440, 1443 (1959) (lowering of wage offer not evidence of bad faith). Compare N. L. R. B. v. National Shoes, Inc., 208 F.2d 688, 692 (2 Cir. 1953).

Southern Airways, Inc., supra; cf. American Airlines, Inc. v. Air Line Pilots Ass'n, supra 169 F.Supp. at 793. In economic disputes under the NLRA, the employer who has bargained in good faith may, when an impasse is reached and a strike occurs, hire permanent replacements for striking employees. N. L. R. B. v. Mackay Radio & Tel. Co., supra, and cases cited immediately below. Furthermore, it may individually inform the striking employees that they must either return to work on the basis of its last offer or face the threat of replacement. Robinson Freight Lines, 114 N.L.R.B. 1093 (1955), enforcement granted N. L. R. B. v. Robinson, 251 F. 2d 639 (6 Cir.1958); Texas Co., 93 N.L. R.B. 1358 (1951), set aside on other grounds Texas Co. v. N. L. R. B., 198 F. 2d 540 (9 Cir.1952); Kansas Milling Co. v. N. L. R. B., 185 F.2d 413 (10 Cir. 1950).[19] Accordingly, I conclude that Eastern, under the circumstances in which it found itself, could hire and train copilots to replace the strikers. Eastern's letters informing the strikers of its intentions did not exceed the boundaries of lawful "self-help."[20] I find that on the evidence before me Eastern has not bargained directly with individual flight engineers, nor has it executed agreements with them with the intended and ultimate effect of coercing them and otherwise interfering with the selection of their bargaining representatives.

IV

Eastern has also argued that the union has failed to comply with Section 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108, and therefore the remedy of an injunction is unavailable to it. That Section provides, *inter alia*, that no injunction should be granted to a complainant "who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." Eastern contends that the union's repeated past refusals, before it went on strike, to submit to mediation or arbitration at the exhortation of various high government officials is fatal to its cause.[21] See Brotherhood of R. R. Trainmen v. Toledo P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944). However, on the view of the case already taken, it is not necessary to explore this argument.

 On the record before me made by the parties on this motion for a pre-

19. Cases have held that the employer may not notify the employees that the act of striking terminated their employment, see N. L. R. B. v. U. S. Cold Storage Corp., 203 F.2d 924 (5 Cir.), cert. denied, 346 U.S. 818, 74 S.Ct. 30, 98 L. Ed. 344 (1953), or that a failure to return to work by a specified date would constitute termination, see N. L. R. B. v. Beaver Meadow Creamery, 215 F.2d 247 (3 Cir. 1954) (alternative holding). Regardless of the distinctions, substantive or semantic, upon which these cases may turn, see Shopmen's Local 774 v. N. L. R. B., 219 F.2d 874 (6 Cir.), cert. denied, 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955), no such problems are presented by Eastern's letters.

20. The cases cited by the union are not to the contrary. They involved employers who dealt in the first instance with individual employees rather than their representatives, Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Order of R. R. Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944), an employer who refused to bargain collectively with a newly certified representative because of the existence of contracts previously made with individual employees, J. I. Case Co. v. N. L. R. B., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), an employer who by organizing a company union attempted to impede its employees' exercise of their rights to choose a bargaining representative, Virginia Ry. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), and an employer who unilaterally attempted to raise its employees' wages after refusing to bargain with their representative, May Dept. Stores Co. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945). These cases are clearly inapposite to the problem presented here.

21. See text at p. 8 supra.

liminary injunction, I do not feel that the Flight Engineers have shown by "clear and convincing" facts, see American Airlines, Inc. v. Air Line Pilots Ass'n, supra, 169 F.Supp. at 793, that Eastern's actions have violated their legal rights, or that they have a reasonable probability of success in final hearing on these points. 169 F.Supp. at 795. Accordingly, under all the circumstances, the motion for preliminary injunction should be denied.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S. C.A.

Settle order on notice.