**FLIGHT ENGINEERS' INTERNATIONAL ASSOCIATION, AFL–CIO, EAL CHAPTER, Appellant,**

v.

**EASTERN AIR LINES, INC. and Air Line Pilots Association, Appellees.**

**No. 408, Docket 27793.**

United States Court of Appeals Second Circuit.

Argued Sept. 20, 1962.

Decided Jan. 4, 1963.

William B. Peer, Washington, D. C., of Patt & Heimowitz, New York City (Zimring, Gromfine & Sternstein, Washington, D. C., on the brief), for appellant.

Burton A. Zorn, of Proskauer, Rose, Goetz & Mendelsohn, New York City (W. Glen Harlan of Gambrell, Harlan, Russell, Moye & Richardson, Atlanta, Ga., on the brief), for appellee Eastern Air Lines, Inc.

Henry Weiss, of Cohen & Weiss, New York City, for appellee Air Line Pilots Ass'n.

Before MOORE, HAYS and MARSHALL, Circuit Judges.

HAYS, Circuit Judge.

The Flight Engineers' International Association appeals from the denial of its application for a temporary injunction. We affirm the district court's determination.

This case presents one phase of the controversy over the "crew complement" issue, an issue which has concerned the courts in a number of its aspects. (See, e. g., Pan American World Airways, Inc. v. Flight Engineers Int'l Ass'n, 2 Cir., 306 F.2d 840 (1962); Flight Engineers Int'l Ass'n, etc. v. Eastern Air Lines, Inc., 208 F.Supp. 182 (S.D.N.Y.), aff'd, 2 Cir., 307 F.2d 510 (1962). Various airlines, the flight engineers union and the air line pilots union have been involved for several years in a dispute as to the constitution of cockpit crews on jet planes. Governmental regulations require a crew of three, two of whom are qualified as pilots and one of whom holds a flight engineer's certificate. The flight engineers union has insisted that the flight engineer in the crew hold an "A and P" (airframe and power-plant) license, a condition which in practice requires the presence in the cockpit of an engineer represented by that union. The air line pilots union has been equally insistent that three qualified pilots be included in the crew. In the past the employers have solved the difficulty presented by the competing demands of the two unions by employing a crew of four. They are now determined to reduce the crew to the three required by government regulation. The defendant Eastern Air Lines has been willing either to give one of the pilots engineer's training or to give the flight engineer pilot's training. Neither of these solutions has been found acceptable by both unions.

It would serve no useful purpose to detail again the series of strikes engaged in by each of the unions over the various attempts to resolve the crew complement issue, nor the repeated interventions of the National Mediation Board, presidential emergency boards, a special commission designated by the President, the Secretary and Undersecretary of Labor and the President himself. The history is set forth by Judge Feinberg in 208 F.Supp. 182. See also Pan American World Airways, Inc. v. Flight Engineers Int'l Ass'n, etc., supra. It is sufficient to say that all such efforts have failed.

The strike of the flight engineers union which is the occasion of the present controversy began on June 23, 1962. On July 18, 1962 Eastern sent a letter to each of the striking flight engineers stating that:

"In order to return to work it will be necessary for you to report *in person* * * * on or before July 24, 1962, at which time you will be allowed to elect whether or not you will take the jet flight engineer training and thus be eligible for jet assignments."

Some of the flight engineers returned to work in response to the letter. Eastern recruited from among its pilots about 80 to take flight engineers training and thus to become "pilot-engineers." In connection with the latter move, Eastern negotiated a series of agreements with the pilots' union which regulated the retention by the pilots who became pilot engineers of their seniority as pilots, and provided for their compensation and other terms and conditions of their employment as pilot engineers.

The flight engineers now seek an injunction requiring defendant Eastern Air Lines to bargain exclusively with the flight engineers union with respect to the terms of employment of those hired as pilot engineers and restraining Eastern and the air line pilots union from bargaining as to those terms of employment and from giving effect to any agreements between them which concern those terms of employment.

■ Under the Railway Labor Act (45 U.S.C. § 151 ff.) it is the duty of the courts to enforce the statutory command to bargain collectively. Virginian Ry. Co. v. System Federation No. 40, Ry. Employees, 300 U.S. 515, 57 S.Ct.

592, 81 L.Ed. 789 (1937). But the courts may act only where it is clear that the duty to bargain exists. Where there is doubt as to representation and where there are rival jurisdictional claims, those doubts are to be resolved and the claims are to be vindicated or rejected not by the courts but by the administrative and other processes provided by the Act. General Committee, etc. v. Missouri-Kansas-Texas R. R., 320 U. S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943); General Committee, etc. v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943); Division No. 14, Order of R. R. Telegraphers v. Leighty, 298 F.2d 17 (4th Cir.1962); Flight Engineers Int'l Ass'n, etc. v. Trans World Airlines, Inc., 205 F.Supp. 137 (S.D.N. Y.1962).

In the present case there is a dispute as to representation and there are rival claims of jurisdiction. Both unions claim to represent the employees who are classified as "pilot-engineers." An injunction is sought to force the employer to bargain with the flight engineers union rather than the pilots union with respect to the conditions under which these "pilot-engineers" shall be employed. The pilots union urges that it is entitled to bargain for these employees.

This situation presented is almost completely analogous to the situation found in the M. K. T. case, supra. There both the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen claimed the right to bargain with the employer as to the terms and conditions of employment of engineers called for emergency service. Holding "that the issues tendered by the present litigation are not justiciable" (320 U.S. at 327, 64 S. Ct. at 148), the Court traced the history of the Railway Labor Act and concluded that:

"[I]t is apparent on the face of the Act that while Congress dealt with this subject comprehensively, it left the solution of only some of those problems to the courts or to administrative agencies. It entrusted large segments of this field to the voluntary processes of conciliation, mediation, and arbitration. * * * Those instruments, in addition to the available economic weapons, remain unchanged in large areas of this railway labor field. On only certain phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. Congress was dealing with a subject highly charged with emotion. Its approach has not only been slow; it has been piecemeal. Congress has been highly selective in its use of legal machinery. The delicacy of these problems has made it hesitant to go too fast or too far. The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate." 320 U.S. at 332–333, 64 S.Ct. at 150–151.

The Court added:

"It seems to us plain that when Congress came to the question of these jurisdictional disputes, it chose not to leave their solution to the courts. As we have already pointed out, Congress left the present problems far back in the penumbra of those few principles which it codified. Moreover, it selected different machinery for their solution. Congress did not leave the problem of inter-union disputes untouched. It is clear from the legislative history of § 2, Ninth that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. H. Rep.No.1944, supra, p. 2; S.Rep.No. 1065, 73d Cong., 2d Sess., p. 3. However wide may be the range of jurisdictional disputes embraced

within § 2, Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive. If a narrower view of § 2, Ninth is taken, it is difficult to believe that Congress saved some jurisdictional disputes for the Mediation Board and sent the parties into the federal courts to resolve the others. Rather the conclusion is irresistible that Congress carved out of the field of conciliation, mediation and arbitration only the select list of problems which it was ready to place in the adjudicatory channel. All else it left to those voluntary processes whose use Congress had long encouraged to protect these arteries of interstate commerce from industrial strife. The concept of mediation is the antithesis of justiciability.

"In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied. Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals. There may be as a result many areas in this field where neither the administrative nor the judicial function can be utilized. But that is only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration. See H.Rep.No. 1944, 73d Cong., 2d Sess., p. 2. Courts should not rush in where Congress has not chosen to tread." 320 U.S. at 336–337, 64 S.Ct. at 152–153 (footnotes omitted).

Of a similar issue the Court said in the companion case of General Committee, etc. v. Southern Pacific Co., supra:

"It involves, that is to say, a jurisdictional controversy between two unions. It raises the question whether one collective bargaining agent or the other is the proper representative for the presentation of certain claims to the employer. It involves a determination of the point where the exclusive jurisdiction of one craft ends and where the authority of another craft begins. For the reasons stated in our opinions in the Missouri-Kansas-Texas R. Co. case and in the Switchmen's case [Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61], we believe that Congress left the so-called jurisdictional controversies between unions to agencies or tribunals other than the courts." 320 U.S. at 343, 344, 64 S.Ct. at 145.

■ On the authority of these cases it is clear that the district court was without jurisdiction to grant the relief which the plaintiff sought. The doubtful claims of representation and the jurisdictional controversy are subjects upon which the Act provides for non-curial treatment. The courts must refrain from interfering in a field from which Congress has excluded them.

Affirmed.