Milton Shalleck, J.
On July 9,1962, chapter 49, a local law, “ in relation to prohibiting certain improper labor practices ”, became a part of the Administrative Code of the City of New York. It made the violations of its provisions a misdemeanor punishable upon conviction by a maximum fine of $1,000 or by imprisonment for a term up to one year, or by both (§ 1110-2.0 d).
The law is concise. Section 1110-1.0 defines such terms as “Strike”, “Lockout”, “Employer”, “Employee”, “Labor Organization ’ ’ and ‘6 Strikebreaker ’ ’, none of which radically differs from the general conception of the defined words. However, it will serve good purpose to give more exactly the verbiage of the terms “Employee” and “ Strikebreaker ”, as there defined. The former is one “ who performs services for wages or salary under a contract, express or implied, for an employer ’ ’; the latter is one “ who customarily and repeatedly offers himself for employment for the duration of a strike or lockout in the place of employees involved in a strike or lockout.”
*1043 Section 1110-2.0 (a) makes it unlawful for any employer willfully and knowingly to employ strikebreakers to replace employees who are either on strike or locked out; and (b) enjoins people “not directly involved in a strike or lockout ” from recruiting others for employment to replace employees on strike or locked out.
Insofar as the problem here presented is concerned, the core provision (§ 1110-2.0, subd. e) makes it “ unlawful for any * * * corporation * * * to transport or arrange to transport to the city of New York any person or persons for employment for the purpose of having such person take the place in employment of employees in an industry or establishment where a strike or lockout exists.” (Emphasis supplied.)
The Committee on Labor and Industry of the City Council, in its public hearing[1] prior to the law’s passage, characterized the bill as “actually” being a “strikebreaking bill” in that ‘ ‘ it prohibits an employer from employing a strikebreaker ’ ’ and in that “ the third section prohibits the importation into New York of persons who are coming in for the purpose of replacing people who are on strike.” But, explained the vice-chairman of the committee, it “ does not keep an employer who is engaged — in a labor difficulty from going to his usual markets to get replacement help.” The subdivision would not apply to “ employees who are already hired by the company ”, a Councilman stated at the hearing, since the ‘1 subsection c says that you may not transport persons to New York for the purpose of hire.” (Emphasis supplied.)
Counsel candidly advised the court that although those provisions became law some two weeks after the inception of the strike of defendant’s flight engineers, the local law was not inspired by such strike, but by an unrelated one. However, the complainants insist that, being a law of general import, the People, on their complaint, are entitled to all of its benefits in this instance of the flight engineers’ strike, if applicable. With that I agree.
The questions remain: Is the statute applicable? And if it is, do the facts bring defendant within its interdiction? The answers must be found without impairing the ostensibly laudable purpose of the statute to prevent strikebreaking by transporting “ into New York City of 1 any persons ’ mustered outside the city by the struck employer to take the places of the striking *1044 employees ’ ’, as argued by the complainants.[2] Nor can any agreement this court might have with such purpose impinge upon the answers which must be objectively reached. And above all, the answers are to be in line with the avowed purpose of all judicial tribunals to assume the validity of a statute and to strive to uphold it. (Sterling v. Lapidus, 10 A D 2d 180; Thompson v. Wallin, 276 App. Div. 463, affd. 301 N. Y. 476, appeal dismissed 342 U. S. 801.)
This case presents the new law’s first test. No known prior prosecution under its provisions has found its way into this or any other court. The challenge to its validity, if successful, might destroy a proper legislative function in this instance. Therefore, if a solution without resolution of the challenge can be found, the court’s constraint toward that end would be justified. (People v. Finkelstein, 9 N Y 2d 342; Sylvander v. Taber, 19 Misc 2d 1005, affd. 9 A D 2d 1019, affd. 8 N Y 2d 835, appeal dismissed 364 U. S. 629; National Psychological Assn. v. University of State of N. Y., 18 Misc 2d 722, affd. 10 A D 2d 688, affd. 8 N Y 2d 197, appeal dismissed 365 U. S. 298.) The facts must control.
The defendant is an interstate air carrier. It serves 114 cities in 24 States; carries more than 8 million passengers annually; and employs over 18,000 persons. Its allocated routes in the United States, Canada, Mexico and Bermuda, covering 20,452 miles, are required by the Civil Aeronautics Board to be serviced by regularly scheduled flights in accordance with its certificates of public convenience and necessity.
On June 23, 1962, the flight engineers union (EAL Chapter, Flight Engineers International Association, AFL/CIO) went on strike against defendant.[3] The strike persisted at least to the day of the trial herein, originally completely closing down defendant’s operations, with concomitant loss of revenue and with the resulting idling of many thousands of wage-earning employees. Making use of its own nonstriking personnel in the manner hereafter alluded to, defendant was able to resume operations some weeks later.
It is the alleged temporary use of the nonstriking ‘ ‘ supervisory ” personnel by defendant, transported by it from outside *1045 New York City for the specific purpose of replacing the flight engineers on strike, which complainants and the People claim violates the newly-enacted local law, thus making defendant criminally liable.
To prove these facts, the People called four witnesses, all of whom were flight engineers with Eastern Airlines. Succintly, their direct examinations may be summarized as follows:
Mr. Nolte was employed by the defendant for six years. On July 26, 1962, he saw one D. Richardson (whom he knew as assistant chief flight engineer in the Miami, Florida, base of defendant), attired as a flight engineer, doing preflight engineering inspection and testing on the midday plane scheduled from New York to Miami. He saw Richardson board the plane and remain aboard when the plane left Idlewild, New York’s International Airport.
Mr. Beville, employed by defendant for 11 years, having started as a mechanic in Miami in 1952, becoming a flight engineer stationed in New York for defendant in September, 1957, saw one Howard Scott on July 28, 1962, preflight testing and examining a DC-8 plane preparatory to its flight from Idlewild. Scott, who was an instructor in flight training in Miami, left with the plane as its engineer.
Mr. Stewart, an employee of the defendant for over 12 years, the last four and a half years being spent as one of its flight engineers, testified to having seen one Sid Elder whom he knew to be defendant’s chief of flight engineers at Washington, D. C., doing preflight engineering duties on the DC-8 bound for Mexico City as Flight 301 on August 10,1962. He observed him going aboard in regular line uniform. He did not alight prior to the plane’s taking off, the other three members of the crew being other than flight engineers.
Finally, Mr. Heznek, who had been a flight engineer with Eastern Airlines for 15 years, testified to being on picket duty twice weekly since the strike, during which time he saw his “ buddies ” performing duties as flight engineers on many occasions, when they boarded the planes which later took off with them aboard. They were Richardson and Elder, as well as one Sullivan from Boston, Wallace and Rasmussen from Miami and one Duke from Atlanta, among others whom he spotted during his many observations.[4]
This testimony on its face falls far short of the complainants ’ promise in their supplemental brief that nine categories of facts *1046 “ will be affirmatively proved beyond a reasonable doubt ”: viz. : that “ at least twenty-five supervisory ” and “ other out-of-title employees ” were brought into New York “ to replace striking employees temporarily and with regular flights originating in New York City ”; that “ these strikebreaking employees ” based out of New York City “ normally do not ” work the flights otherwise “ manned by rank and file engineers ”; that the purpose of the importation was for “stop gap” purposes until the “ strikers could be permanently replaced by scab pilots ”, among other proof which was to be offered.
On the contrary, the value of the affirmative testimony offered on direct examination was so far diminished on cross-examination as to merit but staccato reference to it.
None of the testifying flight engineers is, or apparently ever was, a resident of New York City. Mr. Nolte originally came from St. Louis, Missouri, and now lives in Deer Park, L. I.; Mr. Beville originally worked for the defendant in Miami, and he, too, lives in Deer Park, L. I.; Mr. Stewart lives in New Milford, Connecticut; Mr. Heznek comes from Pennsylvania, was recruited in California and lives in Merrick, L. I., having never lived in New York City.
Thus, if the purpose of chapter 49 is, as was earlier stated (note 2) to protect the “livelihood and work opportunities of New York City residents”, then surely these witnesses and complainants could not claim the benefits of its goal. There was no proof offered that other New York City resident-striking flight engineers were in any way affected by the importation of supervisory personnel on a temporary basis, even assuming that the complainants could be considered to have substantiated the importation for that purpose.
However, such assumption cannot be made, since cross-examination disclosed that, consistently, the recruitment of personnel during all nonstrike times as well was generally made all over the country. Mr, Nolte admitted that recruitment was “ mostly ” out of New York City; Mr. Beville stated that personnel for the most part comes from such States as Florida, California and Texas, and that his own career background was Florida; Mr, Stewart, too, agreed that most recruitment was made out of New York, that he himself came from Illinois and he was formerly based both in Florida and Atlanta, Georgia; Mr. Heznek was recruited in California.
It is clear, therefore, that there was no unusual or illegal activity, absent a debarring statute, in defendant’s having *1047 brought personnel into New York from out of State to be used in its operations in, or emanating from, New York City.[5]
Further on cross-examination, Mr. Nolte stated that he had not seen Richardson for two months and did not know how long he had been in New York prior to July 26, 1962; and while he did not see Richardson performing a flight engineer’s duties aboard the plane, he “ assumed” that he was so functioning, having deduced this from his observation of Richardson’s checking the plane on the outside. He knew that Richardson was on the seniority list under the company-union labor agreement but he did not consider, on redirect examination, that a flight engineer included “ supervisory personnel ” in its defined terms, since the latter do not pay dues to the union.
Mr. Seville’s testimony concerning Scott did not appreciably differ. He did not know when Scott came to New York; did know, however, that he was a flight engineer but that he held a supervisory position with the company. He knew also that under Civil Aeronautics Board Rules, engineers must fly 90 hours per month, no more than 255 hours per quarter or over 1,000 hours per year, and that Eastern Airlines generally restricts flight time to 85 hours per month.
Mr. Stewart testified in like vein. He did not know what function Elder performed on board Flight 301 or when Elder came to New York City. He was uncertain as to whether chief personnel took over engineering functions on flights but stated that supervisory engineers had to put in flight time to remain qualified.
Nor did Mr. Heznek’s testimony on cross-examination present a conflicting picture. He believed that he would have been informed if supervisory personnel were transferred to New York on a permanent basis from out of State. Therefore, the *1048 men he saw doing preflight duties could only have been temporary replacements. He agreed with Mr. Stewart that supervisory personnel do function on occasion as flight engineers in nonstrike periods and that such personnel are on the seniority list; but, he stated, that while covered in the Bailway Labor Act, they are not covered by the collective bargaining agreement.
Thus, giving the benefit of superlative weight to each material fact testified to by these witnesses, the most that can be said of the sum total of all the testimony offered by the People is that it is inconclusive. Much more can be said of the able arguments made by counsel for both sides concerning the legal points involved. These shall be discussed before returning to a final appraisal of the factual impact upon the subject statute.
I agree with counsel for complainants that the intent of subdivision c of section 1110-2.0 transcends the limitation of ‘ * professional strikebreakers”; that it would encompass the transportation of all persons, whether professional or not, for the purposes hedged by the very words of that subdivision. But I cannot accept the argument on the other hand that all imported temporary replacements are by that fact alone strikebreakers or that the statute is thus violated. First of all, none of the so-called “ temporary ” replacements were proved even remotely to come within the definition of 11 strikebreaker ” contained in the statute itself (§ 1110-1.0); and since the term is there defined, no resort need be had to other “ labor relations acts, federal or state ” to conclude that “ all such replacements are strikebreakers ”, as counsel argues. If, as further argued, subdivision c is distinct from the earlier subdivisions dealing with strikebreakers, he should stay with the import of that subdivision. Secondly, the definition of “ employee ” contained in this very law should also control the meaning of the section and not any other law, Federal or State, not involved in this interpretive criminal action.
At the time of the enactment of this local law, the City Council must be considered to have been well aware of the meaning of “ employees ” in respect of the various Federal and State laws; and if such statutes have made a distinction between the use of temporary and permanent replacements for the striking employees (e.g., Labor Bd. v. MacKay Co., 304 U. S. 333, 345, 346), and the City Council meant to adopt such distinction, the definition would have included such distinction. Instead, despite the fact that supervisory personnel used temporarily to supplant strikers might thus have been excluded, the Council proceeded to include all employees of every nature so long as they performed “ services for wages or salary under a contract of employment, *1049 express or implied, for an employer ”, without regard to title or station with that employer.[6]
If the words used by the Council were vague, uncertain or of doubtful meaning, resort would perhaps be made to other cognate laws already interpreted by the courts. But where words are clear, no substitute meaning should be given to them by the judiciary, even though other meaning might have been in the minds of the Legislature. (Matter of Roosevelt Raceway v. Monaghan, 9 N Y 2d 293, appeal dismissed 368 U. S. 12; Matter of Tishman v. Sprague, 293 N. Y. 42; People ex rel. Knott Management Corp. v. Graves, 286 N. Y. 377; Meltser v. Koenigsberg, 302 N. Y. 523.)
The complainants admit ‘ ‘ that a struck employer has the right to resort to ‘ self-help ’ in an endeavor to operate during a lawful strike ” (Flight Engineers Int. Assn. v. Eastern Airlines, two cases [U. S. Dist. Ct., S. D. N. Y.], 208 F. Supp. 182, affd. 307 F. 2d 510, and Civ. Action No. 62-2586 decided Aug. 10, 1962); but, they contend, since a lawful strike is a protected activity (Labor Bd. v. Drivers Local Union, 362 U. S. 274), new temporary replacements would subvert that legality by depriving the striking employees of their right to work again for their employer when the strike was over (National Labor Relations Bd. v. Thayer Co., 213 F. 2d 748, 752; Home Beneficial Life Ins. Co. v. National Labor Relations Bd., 159 F. 2d 280; General Electric Co., 80 N. L. R. B. 174). This is because the strikers do not lose their standing as employees. They claim further that since the local government is free to legislate in this domain (because there is absent Federal and State legislation) a similar interpretation must be given to the statute and the court should declare “ the defendant’s use and importation of temporary replacements for the strikers ” to be without the pale of permissible activities thereunder.
This is an untenable argument for at least two reasons: first, because the statute itself makes neither distinction in the grades, station or titles in its definition of employees, nor between the permanency and temporary character of replacements. Surely, if, as conceded by complainants the Council can legislate in this field and “ is free to bar their [supervisory personnel] importa *1050 tion no differently than professional strikebreakers ’ and it chose either by design or by inexperience not to do so, this court may not become the Legislature for that purpose in its place. (People ex rel. Griffin v. Mayor, 4 N. Y. 419; Matter of Thomas, 216 N. Y. 426; Matter of Young v. Gerosa, 11 A D 2d 67.) Secondly, it is of inherent incredulity to believe that there is greater protection for the rights of New York City workers to have permanent replacements for the strikers rather than temporary substitutes I If it is for self-help that defendant is allowed to bring in substitutes, it means that the business of defendant can be resumed and that other workers affected by the strike can re-earn their wages until these temporary employees can be relieved by more permanent replacements, or the cessation of the strike and the rehiring of the original employees. (See Labor Bd. v. MacKay Co., 304 U. S. 333, 345-346.) This is so clear as to defy cavil. So that, if the Council has the right to legislate “ for the preservation and promotion of the health, safety, and general welfare of its inhabitants ” (People v. Lewis, 295 N. Y. 42, 48), an interpretation other than that proposed by complainants would be more apt to promote the general welfare of New York City inhabitants.
I revert, therefore, to the language of subdivision e for its rationale in the light of its obvious goal: to protect their livelihood and their work opportunities. The injunction against transportation of an out-of-city substitute to New York City is circumscribed by the words “ for employment.” It means that the transportation is prohibited where the foreign substitute does not yet work for the struck employer and he is brought into New York City for work under a new hiring. If it were meant to apply otherwise, there would be no need for the use of the words “ for employment ”, for the phrase would then add nothing to that meaning. It follows, therefore, that the prohibition against the transportation or the arrangement for transportation to New York City of those hired for replacement of strikers must be new employees, not at the time employed by the defendant.[7]
If any other interpretation were to be given to the words of subdivision c, the struck employer first would be deprived of his usual sources for replacements (which even the complainants do not suggest should occur) and, secondly, he would have the unenviable choice of either shutting down his business completely or obtaining only permanent replacements with the resultant loss of jobs by the strikers —an end which even the *1051 employer would not desire. The People have not sustained the burden of such an interpretation.
It would seem, in any event, that the Legislature in making certain behavior and actions crimes, should be clear and explicit in its legislation; for otherwise undue advantage would be taken of a potential defendant (People v. Munoz, 9 N Y 2d 51, 56; People v. Caswell-Massey Co., 6 N Y 2d 497, 501). Giving to this legislation the most reasonable aspect, the interpretation above reached is impelled.
Finally, the facts adduced upon the trial negate any legal dereliction on the part of the defendant within the interpretation reached herein.
The parties do not agree as to whether the Federal or State Governments have pre-empted this field of legislation. The People and the complainants argue that New York State has done nothing legislatively to occupy the field to the exclusion of local lawmaking bodies (People v. Lewis, 295 N. Y. 42, 51, supra). The Federal Government, they claim, has not done so exclusively either. (Terminal Assn. v. Trainmen, 318 U. S. 1, 7; see, also, Chicago, R. I. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453; St. Louis, Iron Mountain Ry. v. Arkansas, 240 U. S. 518; Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, 256; Huron Cement Co. v. Detroit, 362 U. S. 440.)
The defendant on the other hand claims that whether Congress has legislated or not is immaterial. The test is whether 11 there is a potentiality of conflict between the local and national regulation ” (citing San Diego Unions v. Garmon, 359 U. S. 236; California v. Taylor, 353 U. S. 553).
However, the question of pre-emption need not be here definitively decided. I leave it to more sophisticated tribunals to determine in a proper ease. I have assumed that the legislation is within the allowable ambit of the Council’s authority because a decision can be, and has been, here reached without an attack on such authority, as hereinabove set forth.
The motion made by defendant at the end of the entire case for judgment on the ground that the People have not proved it guilty beyond a reasonable doubt, on which motion decision was reserved, is granted, and the defendant found not guilty.
Creel, P. J., and O ’Neill, J., concur.

. All counsel involved — attorneys for the complainants, defendant and the District Attorney — agreed that the court may refer to the minutes of the public hearing in arriving at its decision.

. The earlier proposal, out of which the final version sprang, was reported by the committee to have as its purpose the protection of the “livelihood and work opportunities of New York City residents — against artificially stimulated efforts to induce persons from outside the city to take advantage of their difficulties with employers."

. Neither the reason for the strike nor the relative merits of the contending parties are germane to this criminal action.

. All observations made by the witnesses were from afar, through binoculars, the efficiency of which was not the subject of any testimony.

. From the civil aspect of the controversy, such conduct may be questioned, if by agreement it is prohibited. However, no such activity is dwelt on adversely in the collective bargaining agreement between the defendant and the flight engineers’ union. On the contrary, the contract made in accordance with the Railway Labor Act defines “Flight Engineer” (§ II, subd. B. 1.) as "an employee designated by the Company to serve as such * * * who meets all Government and Company requirements for the position of Flight Engineer” without regard to other title he may have or geographical station to which he may be attached. It thus recognizes the fluidity of operation required by the immensity and complicated management of such an airline. Further, the agreement (§ XIX, subd. H) provides that "A Flight Engineer, who is included on the Seniority list provided for and covered by this agreement, shall be assigned to, and serve at the Flight Engineer station on all flights ”, again without reference to other title or station such engineer may have.

. The Railway Labor Act (U. S. Code, tit. 45, § 151 et seq.) does not contain a definition of “ employee ” comparable to the Labor Management Relations Act (Taft-Hartley) (Air Line Pilots Assn. v. Southern Airways, 49 LRRM 3144, 3154 [U. S. Dist Ct., M. D. Tenn.]). Consequently, since the Taft-Hartley Law does not govern here, no reliance may be had upon it. The exclusion of “supervisory employee” from the definition of “employee” under the Railway Labor Act, the act which governs this collective bargaining agreement (see preamble to agreement) would relegate interpretation here to the words of the instant legislation itself.

. The alleged imported supervisory personnel are presently employed by defendant.