674

Charles H. RUBY, as President of the Air Line Pilots Association, International, and Air Line Pilots Association, International, an unincorporated association, Plaintiffs,

v.

AMERICAN AIRLINES, INC., Defendant,

and

Nicholas J. O'Connell, Jr., individually and as Chairman of the Master Executive Council of the pilots in the service of American Airlines, Inc., and the Negotiating Committee of said pilots, consisting of Richard Lyons et al., Additional Defendants,

and

Joseph V. Manning, as President of the American Airlines Chapter, Flight Engineers' International Association, AFL–CIO, and American Airlines Chapter, Flight Engineers' International Association, AFL–CIO, an unincorporated association, Intervenors.

United States District Court
S. D. New York.

Aug. 12, 1963.

See also 227 F.Supp. 702.

Martin C. Seham, New York City, for additional defendants; Edward F. Campbell, Huntington, N. Y., of counsel.

O'Donnell & Schwartz, New York City, for intervenors; Asher W. Schwartz, Walter N. Kaufman, New York City, of counsel.

WYATT, District Judge.

This action and the controversies involved form chapters in the troubled history of labor relations in the airline industry. Specifically there are charges here of violations of the Railway Labor Act (45 U.S.C.A. § 151 and following; the "Act") which was made applicable to the air lines by amendments effective April 10, 1936 (45 U.S.C.A. § 181).

The action is for an injunction, declaratory judgment and damages and was commenced by President Ruby of Air Line Pilots Association ("Alpa") and by Alpa against American Airlines, Inc. ("American" or "the Company"). Intervention under Fed.R.Civ.P. 24(b) was permitted to President Manning of American Airlines Chapter, Flight Engineers' International Association (the "Chapter"), and to the Chapter; it was represented that there were questions of law and fact in common. The intervenors filed a complaint also for an injunction, a declaratory judgment and damages.

Thereafter intervenors applied under Fed.R.Civ.P. 21 to add as additional defendants Nicholas J. O'Connell, Jr., Chairman of the Alpa Master Executive Council of American pilots (the "American MEC"), and also the members of the Negotiating Committee appointed by the American MEC (the "additional defendants"). After this application had been granted, the intervenors and also plaintiffs served amended complaints, which added averments respecting the additional defendants; the motions are considered on the basis of these amended complaints.

The motions now to be considered (a motion by plaintiffs for summary judgment and a motion by defendant to strike

Cohen & Weiss, New York City, for plaintiffs; Henry Weiss, Herbert A. Levy, New York City, of counsel.

Arthur M. Wisehart, New York City, for defendant; George A. Spater, H. Wayne Wile, New York City, of counsel.

an affidavit, etc. will be dealt with separately) are five in number:

1. by plaintiffs for a preliminary injunction restraining American

a. from negotiating with the additional defendants as a committee of pilots;

b. from refusing to negotiate with Alpa;

c. from influencing, etc. its pilots in their choice of bargaining representatives;

d. from "subverting" the rights of Alpa as bargaining representative of American pilots;

e. from making any agreement as to pilots except with Alpa; and

f. from changing working conditions in violation of the Act;

2. by American for a reference to a master under Fed.R.Civ.P. 53 to determine whether "a majority of defendants' flight deck employees desire the Joint Negotiating Committee to continue to act as their bargaining representative";

3. by intervenors for a preliminary injunction restraining American

a. from negotiating as to flight engineers except with the Chapter;

b. from making any agreement as to flight engineers except with the Chapter; and

c. from refusing to bargain collectively with the Chapter;

4. by intervenors for an order restraining all parties, including the additional defendants,

a. from disseminating a proposed agreement concerning flight engineers;

b. from holding any meetings for considering and voting on such proposed agreement; and

c. from influencing etc. the flight engineers in their choice of bargaining representative; and

5. by plaintiffs for an order restraining the additional defendants

a. from negotiating with American as to pilots;

b. from acting with respect to agreements negotiated by them with American;

c. from influencing etc. the pilots in their choice of bargaining representative;

d. from "subverting" the rights of Alpa under the Act;

e. from making any agreement as to American pilots except through Alpa; and

f. from participating in any change in working conditions in violation of the Act.

*1. Relationship between Alpa and American; Internal Structure of Alpa*

Alpa is a national labor organization organized in 1931 and with Home Office in Chicago. For many years, going back at least to 1939, there have been written agreements between American and its pilots, represented by Alpa. These agreements have been signed by the President of Alpa "for the air line pilots in the service of" American. The last agreement is dated, and became effective, January 21, 1959. It provides that it shall be renewed each year without change unless notice of an intended change is given by one party to the other under Section 6 of the Act (45 U.S.C.A. § 156).

Alpa has been recognized by American for many years as the representative of its pilots. There has not been until recently any "dispute" concerning representation which would bring about a certification by the National Mediation Board ("NMB"; 45 U.S.C.A. § 152, Ninth); the January 21, 1959 agreement recites that Alpa has given "satisfactory proof" of its representation but this recital is a carry-over from earlier years; no proof was in fact given or required and there is no evidence that Alpa was ever chosen as bargaining representative for the American pilots by any ballot or other formal procedure.

The representation by Alpa with which we are here concerned is of American pilots only, and not of pilots on other air lines. This has been the past pat-

tern, the agreements have been executed on such basis, and it appears to be required or contemplated by the Act (e. g., 45 U.S.C.A. §§ 151, Fifth and 152, Fourth and Ninth); Alpa policy is firm for negotiations "individually with each carrier" and against "industry bargaining".

In this connection, the internal structure of Alpa should be noticed.

For each air line, the fundamental unit is the Local Council, one of which is established at each important base of the air line. The Alpa members in each Local Council elect a Captain Representative and a Co-pilot Representative.

The Captain Representatives and the Co-pilot Representatives from all the Local Councils of an air line make up the Master Executive Council ("MEC") of that air line.

The MEC elects a Chairman (called "Master Chairman") and a Vice-chairman.

For each air line there is also a Negotiating Committee, which under Alpa policy is selected or elected by its MEC; the Master Chairman is ex-officio a member of the Negotiating Committee.

Such was the Alpa organization at American. During the relevant period the additional defendant O'Connell was Master Chairman; the Negotiating Committee was composed of Lyons (Chairman), Cuba, Garvey, Atkins, Miller (until his resignation February 18, 1963) and Master Chairman O'Connell (ex-officio.)

The highest governing body of Alpa is its Board of Directors, made up of the Captain and Co-pilot Representatives of all the Local Councils of all the air lines whose employees are represented by Alpa.

The Executive Committee of Alpa consists of the officers, these being the President, First Vice-President, five Regional Vice-Presidents, a Secretary and a Treasurer.

There is also an Executive Board of Alpa consisting of the Chairman and Vice-Chairman of the Master Executive Council of each air line.

2. *The Crew Complement Issue Between Alpa and Feia (or its local chapters)*

To act as pilot of any plane, large or small, requires possession of the appropriate certificate under applicable government regulations. There are various types of certificates, some of which are: student, private, commercial pilot, and airline transport pilot. A commercial pilot's certificate (and "instrument rating") is required to act as a pilot on a commercial passenger plane; the pilot in command must hold appropriate airline transport pilot certificates and ratings. 14 CFR § 40.300.

The addition of a flight engineer to plane crews came about with the development of larger passenger planes during and after World War II. In 1948 new government regulations required that the crew of large planes include the holder of a flight engineer's certificate.

Some carriers, including American, then employed flight engineers with a mechanical background and a flight engineer's certificate but without pilot qualifications. These flight engineers have been historically represented for collective bargaining purposes by Flight Engineers' International Association ("Feia"); the Chapter is the local unit for American, has been certified since 1955 by the National Mediation Board ("NMB") as authorized to represent American flight engineers (45 U.S.C.A. § 152, Ninth), and has had contracts with American concerning working conditions until the last contract expired according to its terms on April 30, 1963.

Other carriers employed as flight engineers qualified pilots who also held flight engineer's certificates. On such carriers, Alpa represented all crew personnel and there was thus one union in the cockpit.

On carriers such as American there were, as indicated above, two unions in the cockpit.

Applicable regulations require a crew of three for larger planes, including jets,

and one crew member must have a flight engineer's certificate. All three *may* be qualified pilots, provided one has a flight engineer's certificate, or it is sufficient that two only are qualified pilots and that the third holds a flight engineer's certificate without pilot qualifications.

Alpa has vigorously fought for what it calls a "fail safe" policy under which all three members of the jet crew must be qualified as pilots (meaning possession of at least a "Commercial Pilot's Certificate and Instrument Rating", usually referred to in short as "C and I"), even though one acts as flight engineer. Feia and its chapters fight against a requirement of any pilot qualification for the flight engineer. This issue is usually called the "crew complement" issue. While supported on each side by safety arguments, the difference in attitude between Alpa and Feia must be to some extent influenced by the struggle over jobs and union membership.

In order to keep labor peace, American and certain other carriers have been flying large planes with a crew of four (three qualified pilots and a flight engineer).

American and the other carriers so situated naturally and properly desire (and feel compelled by the laws of economics) to reduce the cockpit crews to three members as permitted by the regulations and as presently believed on all sides to be entirely adequate for safety.

It is this crew reduction and the handling of the third seat for the flight engineer which is the root cause of the present litigation. In particular, the immediate cause of controversy is that Alpa, a national organization, insists on a *national* policy that all three members of the reduced crew must have at least a "C and I"; the Negotiating Committee for American pilots (despite this national policy of Alpa was willing to agree with American that the flight engineer member need not have a "C and I" (while conforming with all governmental safety regulations) provided the American pilots secured benefits from American in return, such as reduced hours, etc.

*3. Reports of the Feinsinger Commission*

On February 17, 1961, the flight engineers walked out on American and the other major air carriers similarly situated. This forced a virtual stoppage of air transportation.

The walkout resulted from a controversy before the NMB between Alpa and Feia.

Alpa had requested certification by NMB as representative of *all* cockpit crew members (engineers included) of United Air Lines. Feia contended to NMB that flight engineers were a separate "craft or class" (45 U.S.C.A. § 152, Ninth) and should vote separately from pilots for representative.

NMB appointed "a committee of three neutral persons" (45 U.S.C.A. § 152, Ninth), the Chairman being J. Glenn Donaldson, to decide this dispute.

The Donaldson Committee on January 17, 1961 made a decision that all crew members in the cockpit—whether pilots or flight engineers—are "one craft or class" and should vote together "on one ballot" for a bargaining representative.

This was, of course, a victory for Alpa and the walkout of flight engineers took place as a protest one month later.

On February 21, 1961 the President appointed a Commission, with Professor Nathan Feinsinger as Chairman, to investigate and report; the engineers returned to work.

The Feinsinger Commission made a preliminary report on May 24, 1961. The principal recommendations were:

a.  that there be one union in the cockpit and that Alpa and Feia should merge;

b.  that jet planes operate with a three man crew;

c.  that flight engineers on jet planes (subject to job protection in a transition period) be qualified as pilots (that is, have a "C and I"); and

d.  that job equities of the then pilots and engineers be reasonably protected.

The President declared that the parties should "negotiate a final settlement of their differences on the basis of these recommendations."

The Feinsinger Commission submitted a supplemental and final report on October 17, 1961 which expanded some of its recommendations, principally (a) as to the detailed pilot qualifications to be expected of flight engineers on jet planes (which included possession of a "Commercial Pilot's Certificate and Instrument Rating") and (b) as to methods of protecting job equities.

The recommendations of the Feinsinger Commission did not lead to any quick agreement between the pilots, engineers and any air lines. There were further negotiations as to each air line.

For example, Pan American and Alpa, after much negotiation, accepted a request made by the President and on April 17, 1962 agreed to arbitrate their differences. The Pan American engineers declined to arbitrate. This particular dispute engaged the attention in July 1962 of the Court of Appeals for this Circuit. Pan American World Airways, Inc. v. Flight Eng. Intern. Assoc., 306 F.2d 840 (2d Cir. 1962).

It proved impossible to settle in any way the disputes as between Eastern Airlines, its pilots and engineers. A crippling strike was started against Eastern by its flight engineers on June 23, 1962. Some aspects of this were before Judge Feinberg last year in Flight Engineers Intern. Ass'n, EAL Chapter AFL-CIO v. Eastern Air Lines, 208 F.Supp. 182 (S.D.N.Y.1962), affirmed 311 F.2d 745 (2d Cir. 1963).

The situation as to American will be examined in greater detail.

4. *Pilot Negotiations and Mediation before the TWA Settlement*

Negotiations began between American and its pilots (through Alpa) by the service of "openers" in March 1961 by American and by Alpa (acting through President Sayen) under Section 6 of the Act (45 U.S.C.A. § 156). The American "opener" was addressed to the President of Alpa in Chicago.

Meetings were held from time to time in 1961 between American (whose principal representatives have been Vice-presidents Whitacre and Lamond) and the Negotiating Committee. According to practice, the Alpa Home Office in Chicago participated in such meetings through a paid employee (called a "staff negotiator") who reported back to the Home Office. Harkenrider was Alpa staff negotiator with the American Negotiating Committee until withdrawn on November 28, 1962 as later described. It was not usual for any Alpa officer to take part in the negotiations, except in such a case as Miller who was an American pilot and member of the Negotiating Committee and was also a Regional Vice-president of Alpa.

Agreements were not reached in 1961 (possibly waiting on or observing the Feinsinger Commission) and on September 21, 1961 Alpa asked NMB for its mediation services.

On October 21, 1961, American notified Alpa that it accepted the recommendations of the Feinsinger Commission and added them to its Section 6 openers, specifically mentioning the crew complement recommendations.

The situation in American was importantly and significantly affected by the desire (known to the Alpa Home Office) on the part of American pilots for a reduction in hours, an improved retirement plan, and other changes. Alpa President Sayen on November 7, 1961 wrote the NMB that the crew complement problems were "but minor issues on American Airlines" compared to the pilot proposals on retirement and working conditions. While American was willing to accept the Feinsinger Commission recommendations, it evidently did not feel that it could afford to train its flight engineers at its expense to comply with these recommendations and also at the same time grant to its pilots reduction in hours, better retirement treatment, etc.

A mediator from NMB (Michael or "mediator O'Connell", to distinguish him from the additional defendant O'Connell) had been designated in due course

and was attending the pilot negotiations but by June 29, 1962 the pilot situation on American was at a stalemate. The pilots insisted on a reduction in hours, etc.; American insisted that it was impossible to grant these benefits in the face of the expected expense of training flight engineers to secure pilot qualification, the major expense being the qualification of flight engineers with a "commercial pilot's certificate and instrument rating". The mediator felt that an impasse had been reached.

On July 2, 1962, NMB notified the parties that mediation had been unsuccessful and urged an agreement to arbitrate (45 U.S.C.A. § 155, First).

American accepted the proffer of arbitration but on July 11, 1962 Alpa declined it.

NMB therefore on July 18, 1962 notified the parties that its services had terminated; this meant that after the thirty day period under the Act, the parties were free from the Act's restrictions (45 U.S.C.A. § 155, First).

### 5. Flight Engineer Negotiations and Mediation Before the TWA Settlement

The last agreement executed between the Chapter and American was effective May 1, 1958 and was to continue until April 30, 1963 except that "openers" under Section 6 of the Act were permitted to be served as to compensation provisions (Sections 5 and 6 of the May 1, 1958 agreement) to be effective not earlier than May 1, 1961. American by the agreement recognized the Chapter as "duly designated bargaining representative" of its flight engineers as certified by NMB (the certification had been made on May 25, 1955). Unlike Alpa which has Local Councils at each important base, the Chapter includes all flight engineers at all American bases.

In February 1961, Section 6 "openers" as to compensation were served both by the Chapter on American and by American on the Chapter.

The Chapter had a Negotiating Committee on which were President Man-

ning, Apkarian, Petree, and Simpson; unlike Alpa (where the Negotiating Committee was elected by the pilot's MEC), the flight engineers' membership at large elected the Negotiating Committee, the last such election having been held in March or April 1961.

There were negotiating sessions between the flight engineers and American in August and October 1961 but no agreement was reached, again probably because of the developments associated with the Feinsinger Commission.

There were other negotiating sessions in January and March 1962; the engineers believed, however, that American would not negotiate to a conclusion on their wages until the crew complement issue had been settled. Accordingly on March 14, 1962 the Chapter asked NMB for mediation.

Thereafter the NMB assigned Holaren as mediator and meetings took place; that these were unsuccessful was doubtless because of the unresolved crew complement issue and the then pending proceedings in this connection before Presidential Emergency Boards involving other air lines.

NMB recognized mediation as unsuccessful and urged an agreement to arbitrate (45 U.S.C.A. § 155, First). On June 19, 1962 the Chapter refused arbitration and NMB then on June 21, 1962 terminated its services, leaving the parties—after the statutory 30 day period—free from the Act's restrictions (45 U.S.C.A. § 155, First).

### 6. TWA Settlement and Resumption of Negotiations on American

On June 21, 1962, then Secretary of Labor Goldberg was able to announce that TWA and its flight engineers had settled the crew complement issue, subject to ratification by the engineer membership. The settlement was made on the basis of the Feinsinger Commission recommendations, including an eventual merger of the TWA Chapter of Feia into Alpa and possession of a "C and I" by the flight engineer member of three man

crews. Unresolved economic issues were to be arbitrated.

This TWA settlement came about after a serious situation had been created by a strike notice from its flight engineers to TWA and after an Emergency Board had been appointed by the President (on March 20, 1962) under Section 10 of the Act (45 U.S.C.A. § 160).

## 7. Washington July 1962—Pilots and Flight Engineers Meet Separately with American

After the settlement between TWA and its flight engineers had been announced on June 21, 1962, the Labor Department officials wished to encourage a similar and prompt settlement on American. Among other reasons, this was expected to help toward ratification by the TWA flight engineers of the TWA settlement and to help toward settlement on Pan-American and Eastern (whose flight engineers had rejected the TWA settlement and announced a strike for June 23, 1962, which began on Eastern but not on Pan-American); at the same time, a long range labor solution on American itself (a most important domestic carrier) would obviously be in the public interest.

After being so requested by the Labor Department, the Chapter (through its MEC acting unanimously) on July 6, 1962 approved the terms of the TWA settlement as a formula for settling the crew complement issue on American. The Secretary of Labor promptly announced this in a press release.

The Labor Department officials then requested the flight engineers and American to meet with them in Washington; they did so in the week of July 9, 1962.

These officials brought the Company and the flight engineer's committee together for a series of meetings that week in Washington, proposing the TWA formula as the basis for crew complement settlement. The engineers were primarily interested in discussing wages at once, but little progress on this could be made; they were told by the Company to forget about crew complement until it could be negotiated with the pilots.

The Company representatives explained privately to the Labor Department officials that the problem on American was not so much with the engineers as with the pilots, this because the American pilots were far more interested in reduction of hours and other benefits (which would be very expensive for the Company) than in crew complement. In this connection, it was also explained that the American pilots as far back as 1958 had wanted a reduction in hours, etc. rather than the agreement for a four man crew, and that the agreement for a four man crew had been made by American with then President Sayen of Alpa. In fact, the American pilots had suggested to the Company as recently as May of 1962 that they were not interested in having the Company spend its money to qualify flight engineers with a "C and I" under the Feinsinger Commission formula; they wanted a reduction of hours and other benefits instead.

The Secretary of Labor, after considering this explanation by the Company, arranged to bring the pilots to Washington; in the week beginning July 16, 1962, representatives of the pilots, of the engineers, and of the Company were in Washington. Meanwhile, President Ruby of Alpa had also come to Washington by request; he (a long time pilot for National Airlines) had just been elected in June as President of Alpa.

The engineers played little part in the Washington meetings which began July 16; they did not see the Company team at any time; they had one meeting with the pilots; and on July 20 they were excused by the Secretary while the Company and its pilots negotiated.

At the request of the Labor Department officials and with the participation of Chairman Edwards of NMB, the pilots and the Company worked steadily in Washington from July 16, 1962 until July 25, 1962.

The effort, under suggestions from Chairman Edwards, was first to try to

agree on as many items as possible and leave to one side those items on which it appeared difficult to agree. Thus many provisions were in fact agreed upon, but these are of no significance here.

Ruby of Alpa was present at many of these meetings and Harkenrider of Alpa was present at all of them (and at all other pilot meetings with the Company until his removal by Alpa on November 28, 1962); the agreed items were in fact initialed by Harkenrider for the American pilots.

The differences between the Alpa national organization and the Alpa local American organization—those differences which finally led to the present litigation—became more evident in Washington in July 1962 to those organizations, as well as to the Company itself.

For example, Ruby met informally with the Company and two of the chief pilot negotiators at the Hay-Adams Hotel on July 22. O'Connell, one of the chief pilot negotiators and now an additional defendant, there made it clear that his group was primarily interested in reduction of hours and other benefits and if it were necessary to save the Company money on flight engineer training in order to secure such benefits, his group would consider agreeing to a reduction in flight engineer training below that required for a "C and I" as recommended by the Feinsinger Commission. While thus put on notice, Ruby did not agree and stated a contrary Alpa position. O'Connell had earlier the same day in an open meeting, with Chairman Edwards present, stated that the crew complement problem on American was "inversely related to reduction in hours".

The Washington meetings were adjourned on July 25 and, at the suggestion of Chairman Edwards, were to be resumed on July 31, in Fort Worth.

### 8. July 31—November 1 Negotiations Between Pilots and American

The meetings in Fort Worth (July 31—August 2) between the pilots and the Company, with Chairman Edwards present, were significant because the basis was there established for all subsequent negotiations.

The pilots, through O'Connell, made a proposal during these meetings which (apart from details not here significant) was that if the Company would grant them reduced hours and an improved retirement plan, they on their side would agree to a three man crew without insisting that the flight engineer have a "C and I" (thus saving the Company expensive training), and would bring the engineers not only into such an agreement but also into a merger with Alpa so that the Feinsinger Commission recommendation of one union in the cockpit would be accomplished.

This proposal came from the pilots, not the Company, and was often called "O'Connell's iffy"; in fact the proposal came from Alpa itself because the Negotiating Committee was at the time (and for a considerable period thereafter) functioning as an official Alpa bargaining committee with an Alpa Home Office staff member in constant attendance. Since the proposal conflicted, however, with the strong position theretofore taken by the Alpa national organization, the Company raised the question in Fort Worth and later whether the pilots could secure an Alpa approving signature. The pilots were apparently confident that the Alpa Home Office would go along and told the Company team that Alpa policy had been changed at its last convention and that they (especially Garvey) had a good deal to do with Alpa policy in this area. Moreover, Miller, a Regional Vice-President of Alpa, was a member of the pilots' Negotiating Committee and was at the Fort Worth and many other meetings; Harkenrider, the Alpa staff negotiator, was also there and at all other meetings until late November. The American pilots did not at this time contemplate any break away from Alpa.

The Company team was interested, felt that the one union condition was (among other things) highly important, and ask-

ed for a recess so that the cost of the proposal could be calculated.

There was then a series of meetings between the Company team and the pilot's team at Washington, Los Angeles and New York.

These meetings, and all other negotiating meetings relevant here (except those about pilot-flight engineer merger into one union), were attended by Chairman Edwards of NMB or mediator O'-Connell or mediator Schoonover; sometimes Chairman Edwards and one of the other mediators would both attend. All the negotiating meetings indicated were either arranged by, or the time and place had the approval of, the NMB personnel.

There were still many vexing issues between the Company and its pilots, even though their main objectives may have become common. For example, how much of a reduction in maximum work hours per month should be made? The pilots wanted a low figure, the Company a higher figure than the pilots.

Finally, in middle or late September, the Company and pilots felt sufficiently agreed in principle that they suspended their meetings to permit O'Connell and his pilot committee to deal with the flight engineers and bring about their agreement to the contemplated arrangement with the Company and to a merger agreement with Alpa.

### 9. Pilots—Flight Engineers Talk Merger; July—November 1962

In mid-September 1962 when the settlement plan proposed by O'Connell in Fort Worth had thus been made the basis of an agreement with the Company in principle, the pilots turned to talks with the engineers in order to secure their acceptance of the plan, including merger with Alpa.

An opening had already been made for these talks. O'Connell had explained his plan to Chapter President Manning in July even before presenting it to the Company. The day after the Fort Worth meetings adjourned, O'Connell and Harkenrider met in New York (on August 3) with Manning and with Chapter counsel; they also met in Los Angeles with Manning alone before the talks there on August 29 and 30 between the pilots and the Company.

The engineers were certainly prepared to accept as satisfactory everything to be done by American under the O'Connell plan. While they had accepted the recommendations of the Feinsinger Commission, the requirement of a "C and I" for the flight engineer was no article of faith with them; quite the contrary. Accordingly, if the pilots were willing to agree with the Company to eliminate this particular recommendation, the flight engineers would have no objection.

Acceptance by the American Chapter of the Feinsinger Commission recommendations had meant acceptance of the principle of one union for all cockpit employees. To put this principle into practice, however, was a matter of some difficulty.

From about mid or late September 1962 to the end of October 1962, the pilot's committee and the flight engineer's committee met in New York (no mediator or any other third persons being present) and discussed the terms on which the Chapter would be merged into Alpa. The flight engineers did not negotiate with the Company during this period, but talked with the Company team on September 21 and in mid-October to confirm the Company's attitude as reported by the pilots and to exchange general views.

The merger negotiations were based on merger of the Chapter into Alpa and its constitution, by-laws and policy manual—at the insistence of the pilots—were to be controlling. The flight engineers were told by the pilots, as the Company had been told, that Alpa would go along with an agreement even though a "C and I" for all crew members was not required.

By the end of October, an agreement of merger had been almost completed, but some important points had not been resolved.

One of these was the pay relationships between flight engineers and pilots. The engineers were giving up to Alpa their separate representation as against the Company, so that after the merger wages for engineers would be negotiated by Alpa. There are about 600 flight engineers employed by American as against about 1600 pilots. It was therefore desired to put into the agreement some percentage figure as the minimum relationship between the two pay scales, so that there could be some standard for future negotiations. It proved impossible to agree readily on this percentage figure, but it was agreed between pilots and engineers that the Chapter negotiating committee would separately negotiate with American on engineer wages for the contract then to be made, and that the engineer wage thus negotiated would form the basis for the pay relationship with pilots to be inserted in the merger agreement.

By the end of October and after much time had been spent by the pilots and the engineers trying to agree on all points, the Company appeared impatient to start formulating a crew complement agreement. At the suggestion, or at least with the approval, of Chairman Edwards, the pilots and engineers agreed to put their merger talks to one side for the time being and to sit down with the Company on the crew complement issue.

10. *First Joint Pilot-Flight Engineer Negotiations With American; Crew Complement Agreement of December 1, 1962*

The first meeting of the Company jointly with the pilots and the flight engineers was on November 1.

Reports as to the merger negotiations of the two unions were made to the Company by O'Connell for the pilots and by Manning for the engineers. It was plain from these reports that merger was still a thing of the future.

Manning explained the understanding of the engineers: that, although a crew complement agreement was now to be discussed, it was to be effective only as part

of an overall agreement which would include merger agreement between the two unions, a basic working agreement for pilots and engineers (including pay provisions for engineers), etc. Either Manning or Schwartz (Chapter counsel) or both referred to the fact that both pilots and engineers would be "pilots" under the contemplated arrangements, all would be one, and O'Connell would speak for all in the negotiations.

The crew complement discussions lasted off and on all during November. The engineers spoke frequently for themselves, their counsel likewise. The pilots and the engineers made separate written proposals to the Company.

These discussions finally resulted in an agreed document setting forth the provisions to govern the crew complement reduction from four men to three men. This document was initialed on December 1, 1962 by O'Connell for the pilots, by Manning for the engineers, and by Whitacre for the Company. The initialed document was then given to mediator O'Connell, who later gave it to Chairman Edwards.

Harkenrider, the Alpa staff negotiator, had been withdrawn (for reasons shortly to appear) by Alpa on November 28, 1962, just before the initialing.

The December 1 crew complement document was drawn as a "memorandum of agreement" between, and to be executed by, the Company, Alpa and the Chapter. Some of its important provisions were:

a. the Company can convert to a 3 man crew on jet planes;

b. the present American flight engineers are "pilots" under the agreement; when serving as flight engineers in a 3 man crew they are called flight officers; and they may qualify by having "any type of pilot certificate" (that is, less than a "C and I"; for example, a student's certificate) and by taking certain prescribed training;

c. the present American flight engineers are to be consolidated with

the pilots "into one unit * * * for the purpose of collective bargaining representation" and it is represented that a majority have chosen Alpa "as their exclusive collective bargaining representative"; and

d. the Chapter "irrevocably relinquishes any right it may have to represent employees of the Company" and "acknowledges" that the Company may treat Alpa as the "exclusive collective bargaining representative" of the present American flight engineers.

The December 1 crew complement document settled many of the important and vexing problems as between American, its pilots and its engineers but—whatever the significance of the initialing may have been—it was, as Whitacre testified, "subject to a complete agreement". That "complete agreement" has never been reached.

Nothing which was said or done in these joint negotiations justified the Company in believing that the engineers had given up their representation rights to a "joint committee" or otherwise. It was clear that the giving up would only occur *after* a complete and overall agreement had been reached by all parties, which unfortunately never came to pass.

### 11. Rift Within Alpa; Recess of the Negotiations in December

From at least August 2 (Fort Worth), the Alpa national organization and the Alpa local American organization were each set on a collision course. Only a change of direction by one or the other could have avoided the collision, the legal effects of which are now to be determined.

The Alpa national organization was insisting that each member of a 3 man crew must have a "C and I". Any chance of a relaxation of such policy or of a compromise by Alpa disappeared with developments on the other large air lines.

On September 25, 1962, an agreement was executed by Ruby (for Alpa) acting for all TWA pilots, and by TWA, providing (among many other things) for a "C and I" for all members of a 3 man crew on TWA. The TWA engineers ratified the settlement and executed their agreement on November 21, 1962.

On September 7, 1962, Ruby had executed a similar agreement (for Alpa) acting for all Pan-American pilots.

After the strike of flight engineers on Eastern (which began June 23, 1962) had dragged on for several months, Eastern made some arrangement with Alpa under which pilots (with the necessary flight engineer's certificate) took over the seat of the flight engineer; thus on Eastern all members of a 3 man crew have at least a "C and I".

According to Ruby, by January 1963 all of the air lines except American and Trans Caribbean were operating under a "C and I" requirement for all members of a 3 man crew.

Against this background, it seems clear that Alpa as a national organization would find it difficult to make a policy exception so that American would be the only major air line without the expensive "C and I" requirement for flight engineers.

The elected representatives of the American pilots (its Alpa MEC) and the appointed Alpa Negotiating Committee were ready and willing, however, to make a trade with American under which they would receive a reduction in hours and an improved retirement plan against waiver of any "C and I" requirement for the flight engineer. There is nothing surprising or unreasonable about such an attitude.

The Company thus found itself between these two opposing positions, but would naturally attempt to find an accord with its own employees. It therefore accepted in principle the proposal made by its pilots, as an Alpa Negotiating Committee, in Fort Worth about August 1.

Ruby did not learn of the Fort Worth proposal until about the middle of September. He then promptly sat down

with the American committee and made it clear that he would insist that a "C and I" for the flight engineers be part of any settlement. The pilots insisted that they preferred, and would demand, a reduction in hours. Ruby apparently felt that both were possible; in this, he was mistaken.

In October, Ruby had apprehensions as to the course of negotiations and asked O'Connell to attend an Alpa Executive Committee meeting in Chicago on October 23. O'Connell did so. He apparently gave the position of his group with frankness, because Ruby says the Executive Committee then "found out definitely" that the American pilots were not insisting on a "C and I" for the flight engineer. The Alpa Executive Committee adopted a resolution informing the American pilots that Alpa policy "requires a Commercial and Instrument Rating" for the third crew member and that "this concept must be met". Miller was the only pilot from American on the Executive Committee and if present at the meeting he abstained on the vote.

Ruby met with O'Connell and the American Negotiating Committee on November 1 and 2 and again asserted their obligation to follow Alpa "mandatory policy" as to flight engineer qualifications. Ruby outlined his idea of how they should negotiate, they agreed to try it out, but Ruby could see that they were reaching an "adamant position".

As November wore on and the American pilots remained "adamant", Ruby again referred the matter to the Alpa Executive Committee which on November 27 advised that Harkenrider be removed as staff negotiator with the American pilots because of his failure to reflect the October instructions from the Executive Committee (Harkenrider attended no American negotiating sessions after November 28). The Alpa Executive Committee also declared that "continuation of negotiating sessions inconsistent with Alpa policy is already destructive and intolerable". On the same day (November 27) Ruby sent a telegram to Chairman Edwards asking that the American negotiations "be suspended", but no such suspension in fact took place; on the contrary, the negotiations continued until the initialing of the December 1 crew complement document was accomplished, and for a few days thereafter.

On the same date—November 27—the Alpa Executive Committee asked the American Negotiating Committee and Harkenrider to appear before them the following day. Harkenrider did appear and gave a complete report; O'Connell and the rest of the American Committee did not appear. The Alpa Executive Committee adopted resolutions that the American negotiations "be recessed * * * until * * * there is complete understanding as to the direction of such negotiations and a resolution of the controversy on crew complement" and that "such understanding be in writing". Miller, the only American pilot on the Executive Committee of Alpa, was apparently not present; those voting were all on air lines other than American.

After sending copies of the resolutions to O'Connell, Ruby again met with him and the Negotiating Committee on December 5 and 6. Ruby was unable to get any satisfactory "understanding * * * in writing" from the Negotiating Committee.

Ruby also went with O'Connell on December 6 and had a discussion with Whitacre. It is not clear to what extent Ruby was told of the December 1 initialed document; certainly he was not given a copy of it. The point seems without much significance because in any event Ruby had full knowledge of the negotiating attitude of the American Committee, namely, that they would not insist on a "C and I" for flight engineers.

At the December 6 discussion with Whitacre, he and Ruby did agree (over the objections of O'Connell) that the negotiations would stand in recess—with the approval of Chairman Edwards—until some time in January.

12. *Final Split Within Alpa; the Company Decides to Continue Negotiations with the Committee of its own Pilots*

The American MEC met in Chicago on December 11, 12 and 13. Ruby was with them on several occasions; the old ground was covered; there was no change. It was agreed, however, that the American MEC would meet in joint session with the Alpa Executive Committee.

Ruby then on December 19 called in the Master Chairmen of the thirteen air lines flying jet planes, including O'Connell of American; Ruby asked if he had been correctly stating Alpa policy and he gave O'Connell an opportunity to explain the American Committee's views. Eleven of the Master Chairmen declared that Alpa policy required as a minimum a "C and I" for all flight engineers; O'Connell and another dissented.

On January 3, 1963, the Negotiating Committee met with Whitacre on an unrelated matter (the "wet lease"); at that time O'Connell told Whitacre that the American MEC had directed that negotiations be resumed on the same basis as before the recess. Whitacre said the Company was not in a position to resume negotiations until more had been heard of the American Committee's status and until Whitacre could talk it over with Chairman Edwards.

The American MEC met in Chicago again from January 8 through 11, 1963, with some 22 members present. The MEC met separately, met with President Ruby, and met jointly with the Alpa Executive Committee. Ruby stated perfectly clearly the "mandatory policy" of Alpa to require a "C and I" for flight engineers and he reminded the American pilots that there had never been an agreement on any air line "which contemplated less than a commercial license and instrument rating for the third crew member on jet equipment".

The American pilots were equally clear and were "adamant". The American MEC at Chicago resolved unanimously and "speaking for the entire AAL pilot group" to authorize the Negotiating Committee to conclude an agreement with American without requiring flight engineers to have a "C and I". The American MEC further authorized the Committee to advise the Company that the pilots were "agreeable to implementation of said contract with or without formal approval of the Alpa". The American MEC declared that the pilot group had "no intention of giving up demands regarding reductions in flight time and duty formulas that have been successfully negotiated".

At this point, the split between the American MEC and the Alpa national organization became complete and it later proved to be final.

On January 11, Ruby notified the American Negotiating Committee that no negotiations could take place without "prior approval" of Ruby himself. He also gave notice that such "prior approval" was required before Alpa would reimburse the Negotiating Committee members—as had been the practice in the past—for their expenses and for loss by them of flight pay while acting as negotiators.

Under date of January 11, Ruby also notified the President of American that any negotiations with its pilots had to be "with the presence and consent" of Alpa and that further negotiations could only take place by "arrangement" with Ruby.

On January 11 at New York, O'Connell again asked Whitacre to resume negotiations with his committee. This time he told about the American MEC resolutions at Chicago and also said that any agreement reached would be submitted for ratification by 75% of American's pilots; he asserted confidently that this could be secured easily.

Whitacre then on January 15 explained the situation to Chairman Edwards, who advised in substance that the Company had no choice but to resume negotiations with the American Committee, that it was the same committee as before and that there was no other committee with

which to negotiate. Testimony by Whitacre to this conversation was received over objection by plaintiffs and intervenors that it was not binding and was hearsay and further that Chairman Edwards could not, or would not, be called by them to testify because of a suggested privilege arising from NMB regulations. These objections are not believed to be well taken, but even had the testimony been excluded the conclusion would be the same. The record shows without contradiction that when, as will be seen, the Company did resume negotiations with the American pilot committee, Chairman Edwards or another NMB mediator (Schoonover at this period) was always present, or both together were present. This in itself shows an approval by the mediators of the course which the Company decided to follow; such an approval has no force as a matter of law but is significant in determining the Company's good faith.

On January 16, O'Connell, as Chairman of the American MEC, sent a letter to the President of American containing the text of the American MEC Chicago resolutions and repeating in substance what had earlier been told to Whitacre about resuming negotiations.

On January 16, 1963, negotiations were in fact resumed between the Company and the pilot's negotiating Committee; the composition of the committee was the same, except that Miller was away on a trip to Africa; neither Harkenrider (who had not been a member of the committee) nor any other Alpa employee was present.

On January 17, 1963, the engineers negotiating committee joined the negotiating group.

It was therefore the Company's decision, on or about January 16, 1963, to negotiate with the American pilot's committee despite the opposition and warnings of Alpa. The Company refused to bargain with the Alpa national organization; it decided to bargain with the negotiating committee of its pilots, which committee had been chosen under Alpa auspices and procedures.

*13. American had Reasonable Grounds to Believe That the Negotiating Committee Represented a Majority of the "Craft or Class" of its Pilot Employees and Acted in Good Faith in Continuing to Deal With That Committee so far as Pilots are Concerned*

Whether the Company acted in good faith in continuing to bargain with the Negotiating Committee appears to be an issue of fact. Consideration of all the evidence, including that contained in the foregoing recital, leads to a conclusion that in an unhappy situation the Company did act in good faith and without any improper influence, coercion or assistance with respect to any of its pilot employees.

The question before the Company under the Act was: who was the "representative" of the "craft or class" of American pilots, the American Negotiating Committee or the Alpa Home Office?

The credentials of the American Negotiating Committee were far more impressive in this respect than those of the Alpa Home Office.

The Negotiating Committee had been selected by the American MEC and in effect the Company was dealing with the American MEC itself, since the Committee reported to and received instructions from the MEC and the Master Chairman was a member ex-officio of the Committee. The American MEC was made up of the *only* representatives *elected* by American pilots; during the dispute with the Home Office, elections of such representatives by American pilots continued to take place at six months intervals, one-third being elected each six months, the most recently elected representatives taking office on October 1, 1962, and April 1, 1963. The MEC, according to Alpa policy, is "the highest governing body" for the pilots on an air line; likewise, elected representatives must represent "their constituents" according to Alpa policy and failure to do so is said to be against the interests of Alpa itself. The American MEC supported, approved and rati-

fied all that its Negotiating Committee did.

The Alpa Home Office and its several members who had discussions with the Company—Ruby, McMurray and Christie—were not employees of American and had not been elected by American pilots. In fact, the decisions made by the Alpa national organization were made by pilots from air lines *other* than American. This is to be considered in the context that under the Act representatives of employees in the air line industry have been selected on an individual carrier basis and negotiations conducted on an individual carrier basis; this is, moreover, a part of Alpa policy which specifies that negotiations must be carried on "individually with each carrier".

The Committee with which the Company elected in January 1963 to continue to deal was exactly the same committee with which it had been dealing all along —a committee which, so far as American could tell, had the confidence and approval of the Alpa Home Office until January 1963.

It was not the Company which caused the split between the Committee and the Alpa Home Office. The proposal to require of flight engineers less than a "C and I"—over which the split occurred— was not made by the Company but by the Negotiating Committee of the pilots, and at a time when this Committee was officially representing Alpa and with an Alpa staff negotiator in attendance.

Nor did Alpa ever present the Company with any feasible alternative to continuing to deal with the old Committee. No new or substitute committee was ever presented to the Company by Alpa, and both uniform past practice as well as Alpa policy required that negotiations be conducted for the American employees by a committee from such employees. The outside national officers and staff members of Alpa were never authorized to carry on negotiations for American pilots, and they never undertook in this instance to do so.

Under the circumstances, it seems impossible for Alpa to have produced a proper Negotiating Committee, other than that already in existence. The Alpa Policy Manual makes it clear that

"The MEC shall appoint or elect the members of the Contract Negotiating Committee."

The American MEC had in fact appointed the Committee with which the Company dealt and, supporting that Committee fully, was not likely to appoint another, either at the request of the Alpa Home Office or otherwise.

All past contracts had been negotiated by the Company with just such a Committee and no President of Alpa had ever refused to sign a contract so negotiated. Indeed, a minor agreement—respecting the "wet lease" by American to British West Indian Airways—was negotiated with this very Committee as late as January 1963 and signed for Alpa by President Ruby.

The Company never suggested that its pilots leave Alpa, and certainly never made it any condition of its promise§ that a separation take place. The Company was ready at all times to sign an agreement with Alpa, but the Alpa Home Office would not sign the agreement as negotiated with the Committee representing American pilots. There may have been good reasons for the attitude of the Alpa Home Office, but with these or the merits of the dispute otherwise this Court can have no concern. To give the Alpa national organization, controlled by employees of other air lines, a veto power over contracts negotiated by the American pilots who must work under the contracts is not consistent with democratic procedure on the American air line system itself.

This is especially true when it is considered that Alpa, as a bargaining representative, is an agent only; it is the American pilots themselves who are the principals. The execution of past agreements bears witness to this; they are signed by the President of Alpa "for the air line pilots in the service of American Airlines, Inc." The elected American MEC is much closer to the pilot princi-

pals than the Alpa Home Office and national organization.

Moreover, it was represented to the Company by the Committee that discussions at the Local Council level had shown a unanimous support for the Committee which could "very easily guarantee" at least a 75% approval by the pilots of any contract negotiated. There seems to have been no reason whatever for the Company to doubt this.

The Company, without any certification or election or other form of choosing by its pilots, had for a long period recognized Alpa as bargaining representative. There seems nothing to prevent the Company in good faith from withdrawing such recognition on the basis of new and convincing evidence.

Finally, the actions of Chairman Edwards and his NMB associates must be taken into account. These could not make legal what was illegal, but on the issue of good faith in a difficult situation they are not without significance and add to the impression that the Company acted properly in its dealings with the pilots.

*14. Further Steps by Alpa; Commencement of This Action*

It may be convenient at this point to refer to the next steps of Alpa before the institution of this action.

Under date of January 18, Ruby sent telegrams to Chairman Edwards and to the Company declaring that the American pilot's committee had no authority to speak for, or to conclude any agreement for, American pilots and that the resumed negotiations were in violation of the Act. On the same day Ruby wrote to the Company (copy to Chairman Edwards) drawing attention to a provision in Alpa's constitution and by-laws requiring approval of the Executive Committee of Alpa or of its president before negotiations can be initiated or agreements executed.

The Company's reply to Ruby (dated January 18) included a statement that Chairman Edwards was present at the resumed negotiations and "advises that the parties should continue to bargain".

Under date of January 24 Ruby then sent three letters: (a) to the Company, again warning that dealing with the pilot's committee was unauthorized and illegal, and asking for a meeting on January 30 "to negotiate an agreement between the Association [Alpa] and your Company"; (b) to O'Connell calling upon him and the committee "to desist immediately" from the resumed negotiations; and (c) to President Manning of the Chapter, giving him copies of the earlier correspondence, and declaring the resumed negotiations "not authorized" by and not "binding" on Alpa.

The reply of Manning to Ruby (dated January 28) stated that the Alpa split "certainly ends our consideration of merger between the two organizations [i. e., Alpa and the Chapter] for the time being". It referred with some bitterness to Alpa's "failure to intervene" at Eastern Airlines, where pilots eventually took over the jobs of the flight engineers. It warned that for Alpa to "press" its disagreement with the American pilots might lead to a strike or to lengthy litigation, either of which would be "unfortunate", and it suggested a request for help to the Secretary of Labor and to Chairman Edwards.

The reply of the Company to Ruby (dated January 28) expressed a willingness to "confer generally" on January 30 but in effect refused to negotiate with Ruby—"a separate and duplicating negotiating session". The reply also stated that whether Alpa became a party to any agreement negotiated by the American pilots was "an internal matter" for Alpa.

A meeting between Ruby and the Company did take place on January 30, but (as might have been expected) it solved nothing. Apparently Ruby tried to get a negotiation started between American and the Alpa Home Office, but he was not successful. The Company asked how another committee of American pilots could be designated; according to all past Alpa practice, negotiations were conducted by a committee of pilots employed by the particular air line and appointed by the MEC, and such a committee was

already in existence. Ruby evidently had no solution for this problem; he contemplated "bringing the existing committee in or whatever arrangement was necessary". The fact is that no substitute or other committee was ever appointed or arranged for by Alpa.

Ruby next instructed Christie, Director of Agreements for Alpa (a staff member), to present himself to American as "the duly appointed Representative". The efforts of Christie were not successful. He went to New York but apparently did not attempt to enter the negotiating sessions. At the suggestion of Chairman Edwards, American officials talked to Christie (with mediator Schoonover present) but nothing came of it.

The Executive Board (as distinguished from the Executive Committee) of Alpa met at Chicago on February 5, 6 and 7. There were about 86 persons in attendance, including O'Connell; also present were other members of the American pilot's committee and of the American MEC. The Executive Board adopted resolutions (a) endorsing Ruby and his interpretation of Alpa policy; (b) declaring that the American MEC and Negotiating Committee "are not the bargaining representative of the American pilots"; (c) directing Ruby or his representatives to negotiate and conclude an agreement with American; and (d) finding the acts of the American MEC and Negotiating Committee "not in the best interests of Alpa".

Under date of February 8, Ruby sent copies of the resolution to the Company, to O'Connell, and to the American MEC.

The Company's reply again stated that it had "no choice but to go ahead" (that is, to continue negotiating with the committee of American pilots), again referred to the advice of Chairman Edwards that it do so, and expressed an inability to see any "way in which separate negotiations can be started".

On February 16, Ruby (accompanied by Alpa counsel) discussed the situation in New York with Company officials. The latter stated that the Company had wanted an agreement with Alpa, was sorry to be in the middle of such a problem, but as between Alpa and the Company's own pilots felt obliged to deal with its pilots.

On February 19, Ruby authorized McMurray and Christie (two staff members of Alpa) to try to start "proper negotiations" with American.

On February 21, McMurray and Christie appeared at a negotiating session in New York. Garvey (a member of the pilot's committee) asked Christie to leave. He and McMurray both left and shortly afterwards McMurray returned with Chairman Edwards and Whitacre. McMurray remained in the session for a while and then left, but before leaving stated that the pilot group did not represent Alpa and that the negotiations were illegal, to which Chairman Edwards took exception.

There were no further contacts by the Alpa national organization with any of the parties and this action was commenced by Alpa on March 1, 1963.

*15. Resumption of Joint Pilots—Engineers Negotiations With the Company; the Substitute Pages; Joint Negotiations Ended by Engineers*

After the Company had decided to bargain with the pilot's Negotiating Committee rather than with the Alpa Home Office, meetings began on January 17, 1963, between the Company and the two committees, one for pilots and one for engineers.

The assumption in these negotiations was that the two unions—one for pilots and one for engineers—would be merged into one union in the cockpit and that one agreement (that being negotiated) would cover both pilots and engineers.

Until a merger agreement between the two unions had been made, there necessarily was separate bargaining representation for pilots and for flight engineers. While the negotiating sessions were at times joint and while O'Connell,

at times acted as chief spokesman for the two committees, it was understood between them that the flight engineers would negotiate their own wages and that their separate representation had not been given up. This was an entirely natural arrangement, not only because at that stage the engineers did not want to put themselves entirely in the hands of the pilots, but also because the pilots themselves hesitated to assume such a responsibility.

Thus as between pilots and engineers, there was no question but that the Chapter continued to be the representative of the engineers. The pilots did not purport to act for the engineers. As O'Connell testified: "We considered ourselves the pilot committee". The pilots never used the expressions "joint committee" or "joint negotiating committee". Especially considering the tentative and dependent character of the arrangements being worked out, there was no reason for the Company to suppose that in advance of complete agreement the flight engineers had given up their separate representation.

### a. The Substitute Pages

During the resumed meetings in January 1963, it became apparent to the pilots and to the Company that execution by Alpa of the agreements being negotiated was highly doubtful, to say the least. The letters from Ruby of January 11 and 18 and his telegram of January 18 gave added confirmation.

The December 1, 1962 "memorandum of agreement" covering crew complement had been drawn up for execution by Alpa (for the pilots) and contained a provision by which the engineers would give up their bargaining representation to Alpa. Feeling that Alpa participation was now not to be expected, the Company prepared new and substitute pages for those pages of the December 1, 1962 crew complement agreement on which the name of Alpa had appeared. This involved a change in the provision for the future merged union of pilots and flight engineers (because it had been assumed that the merger would be with Alpa) and thus for the future bargaining representative of the engineers. The new language proposed by the Company took account of the fact that it was not then known how the place of Alpa would be filled—what the organization would be. The new language in the substitute pages was that the engineers and pilots should be "consolidated into one craft or class unit", that the engineers agree that "their collective bargaining representative hereafter shall be the same as that which now or in the future is recognized by the Company as representing a majority of its cockpit crew members", and that the Chapter gives up its representation rights to "said cockpit crew representative".

These substitute pages were given by O'Connell to the engineers on January 24, were objected to strongly by the engineers, and were the subject of heated controversy with the Company until February 20. The position of the engineers was that under the substitute pages they were asked to give up their representation rights to whatever group the American pilots (or their then committee) decided, that this was an "unknown", and that before they would give up their representation rights they wanted to know with what organization they were dealing and also (importantly) the terms of their merger into such organization.

The Company asked Chairman Edwards for a letter approving the substitute pages but he felt unable to comply. Efforts through language revisions to overcome the objections of the engineers were not successful. On February 20, the Company withdrew the substitute pages and stated that it would stand on the December 1, 1962 wording of the crew complement agreement. This left the situation far from clear, because the December 1 wording was designed for execution by Alpa and if Alpa did not execute the document, it would be in major respects frustrated.

### b. Dispute Over Representation of Engineers and end of Joint Meetings

Meanwhile a further controversy arose between the Company and the engineers. On January 31, the negotiations reached the subject of pay and retirement provisions for the engineers.

The basis of these negotiations was that one agreement would cover both pilots and engineers, who would belong to one union; indeed, the engineers were included under the term "pilots" in the draft agreements then being discussed. The bringing of the pilots and engineers into a single representation was one of the advantages to the Company for which it was bargaining and making concessions.

The Company took the position that on and after November 1 the pilots and engineers were *already* one and that the engineers for collective bargaining purposes were being represented by a "Joint Negotiating Committee", of which O'Connell was chairman or spokesman. Accordingly, the Company position on January 31 was that pay and retirement provisions for engineers were matters for negotiation with the "Joint Negotiating Committee" and not with the engineers' committee separately; the Company declined to negotiate with the engineers' committee separately.

The engineers vigorously contested the Company's position and both verbally and in writing asserted the continuing representation by the Chapter of the engineers as "a separate bargaining unit under the Railway Labor Act".

If there had been no dispute within Alpa itself, probably the engineers and the Company could eventually have found a compromise. But the difficulty was that Alpa and the American pilots had split, and in these circumstances the engineers were unwilling to give up their representation to the "unknown". The Company insisted without justification that they had *already* given up their representation to the "Joint Negotiating Committee".

Doubtless the attitude of the Company was influenced by a feeling that it was unfair for the engineers to demand separate representation while at the same time demanding, or expecting, the benefits promised by the Company in exchange for single representation of pilots and engineers.

Be that as it may, the fact is that the engineers had clearly not given up their separate representation, either to the "Joint Negotiating Committee" or otherwise. There is no evidence that the Chapter ever gave up its representation of the engineers; to the contrary, the evidence is that until a merger with the pilots had been brought about, the Chapter was to continue as before. That O'Connell or other members of the pilots' committee were requested, or permitted, to speak or to make proposals for the engineers was a matter of procedure, not of substance, and did not amount to any relinquishment or transfer of the Chapter's rights.

The joint sessions continued until February 21—the day after the withdrawal of the substitute pages—but the unresolved conflict between the position of the engineers and that of the Company finally resulted in refusal by the engineers to accept the demand of the Company for "joint committee" bargaining only; the engineers attended no joint sessions after February 21.

### c. Events Leading up to Intervention by Engineers in This Action

On February 26, the Master Executive Council of the American engineers had a meeting in Los Angeles. Whitacre and O'Connell were invited, and they addressed the meeting on separate occasions. Among other things, Whitacre indicated that the Company would continue its negotiations with the pilot committee until agreement was reached; that he had a lingering hope of acceptance by Alpa of such an agreement, even without the "C and I"; that if not and if the American pilots left Alpa and formed a separate organization with the

engineers, they would be better off and Alpa would later ask them to come back; and that he felt the Company had an agreement with the engineers on many important points, but was not "holding anybody to it". O'Connell said he hoped the engineers would accept the agreement negotiated by his Committee.

At this meeting in Los Angeles on February 26, the engineers' MEC resolved to ask the help of top officials of the AFL-CIO to resolve the several intra and inter union disputes. These officials made an effort, but there was no success.

Chairman Edwards then attempted to bring the engineers and the Company together again; meetings were held with him by the Company and the engineers on March 6, 8 and 12. The Company would not call these meetings "negotiations" because it maintained the position that it would negotiate with the flight engineers only through the "Joint Negotiating Committee"; the Company called these March meetings "bull sessions" and although many ideas were exchanged, nothing was settled.

Under the May 1, 1958 agreement between American and the Chapter, notice of intended change under Section 6 of the Act could be given as to any provisions of the agreement (whether related to compensation or not) at least 60 days before its expiration on April 30, 1963. Under date of February 28, 1963, the Chapter gave notice to the Company of a desire to change numerous sections of the May 1, 1958 agreement, including sections 5 and 6 as to compensation and as to which notices of intended change had already been served by the Company and by the Chapter in February 1961. The Chapter suggested that a meeting to negotiate could "take place at any convenient time satisfactory to the Company".

Under the same date of February 28, 1963, the Company gave notice to President Manning under Section 6 of the Act of its intended changes in "existing agreements". The Company referred, however, to "current negotiations with the Joint Committee of pilot and flight engineer representatives" and suggested that bargaining "continue under the auspices of the Joint Committee and Mr. Leverett Edwards".

The Chapter, under date of March 7, 1963, notified the Company that it would not bargain through any "Joint Negotiating Committee", that there had been no transfer or release of its rights as bargaining representative of the engineers, and that agreements as to the engineers were therefore required to be negotiated with it; the Chapter stated that it was prepared to meet with the Company "immediately".

There was no response by the Company, which apparently maintained its position of bargaining with the flight engineers only through the "Joint Negotiating Committee".

The Chapter and its president then moved for leave to intervene and serve a complaint in this action. The motion was granted on consent on March 19, 1963.

March 22, 1963, the Chapter notified NMB that it would agree to arbitrate all issues in dispute with American. On March 28, 1963, American notified NMB that it would not arbitrate, because the Chapter's agreement to arbitrate came too late (after its June 19, 1962 refusal) and that intervening events had made arbitration "inappropriate".

### 16. The Company and Pilots Reach Agreement on March 15

Despite the withdrawal of the engineers from the joint sessions, the Company and the pilots' committee continued their negotiations for an overall agreement (or group of related agreements), including provisions affecting the engineers.

During these negotiations and on March 5 and 6, O'Connell reviewed the situation with seven former American MEC chairmen (going back to 1941 or 1942) and with Chairman Edwards. The former MEC chaiman gave O'Connell a written statement approving his efforts to secure a new agreement with the Company and declaring that "nothing should

be allowed to delay or interfere with the implementation of this Agreement".

On March 15, the negotiations were concluded and all agreements were then in form satisfactory to the Company and to the pilots' committee (these agreements will be sometimes referred to for convenience as the "March 15" agreements).

There was a so-called "basic working agreement" and related supplementary agreements, including that covering the crew complement question. The March 15 basic working agreement covered both pilots and engineers, as to compensation and everything else; the engineers are called "Flight Officers" and are also included in the term "pilot"; this agreement was designed to be executed by one bargaining representative for all "pilots", including engineers. The March 15 crew complement agreement is the same as that initialed on December 1, 1962; it contains the name of Alpa in all appropriate places; it was designed to be executed by Alpa, by the Chapter, and by the Company. With the positions of the parties as they were on March 15, it was of course impossible to carry out the scheme contemplated by the March 15 agreements because Alpa had already commenced this action and could not consistently execute the agreements.

Copies of the March 15 agreements arrived at with the pilots were, at their request, provided to them by the Company; likewise the Company on occasions furnished rooms for negotiating sessions, secretarial help, coffee, etc. In volume this appears to have been de minimis and in any event it did not differ from what had been the practice in all past negotiations.

After Alpa and the American pilots had split apart, O'Connell (Master Chairman of American MEC and ex-officio a member of the Negotiating Committee) discussed with Lamond (Vice-president of American for flight) whether the pilot members of the committee could later be reimbursed by the Company for flight pay lost during the negotiations. This came about because such lost flight pay had in the past been paid to the pilots by Alpa itself, but this was no longer to be expected and on January 24, 1963 Ruby notified the American pilots that no further payments would be made. When the subject was raised by O'Connell, the most Lamond would promise was to "consider" it in the future if it were "legal" under the Act. There was no promise of any such payment; there is no evidence that any such payments have been made; and there is nothing in the incident which could possibly amount to unlawful assistance.

### 17. Formation of Allied Pilots Association; its Application to NMB

On March 19 through 22, the American MEC met in New York. The March 15 agreements were unanimously ratified. Ruby was invited to some of the sessions; he did attend and spoke to the group. Among other things, Ruby said that Alpa would not recognize any agreement negotiated by the pilots' committee and that he, as Alpa President, would not sign any such agreement if it did not contain a requirement of a "C and I" for flight engineers.

Anticipating that President Ruby would not sign the March 15 agreements, the MEC authorized the formation of a new organization—Allied Pilots Association—to take over representation of American pilots. O'Connell was named temporary president, other temporary officers were named and the members of the MEC (that is, the elected captain and co-pilot representatives of each Local Council on American) became the acting directors of the new organization.

There is no evidence that the Company suggested, encouraged or even knew in advance about the determination of the American pilots to leave Alpa over the "C and I" issue and form their own organization.

Under date of March 28, Whitacre wrote to O'Connell confirming certain understandings as to the rates of pay and retirement benefits for engineers and adding that as to retroactive pay for

engineers the Company "stands ready to meet with the Joint Committee"; apparently neither this letter nor the March 15 agreements were given to any of the engineer representatives.

The American MEC at its March 19–22 meetings had instructed O'Connell to make one last effort to have the March 15 agreements executed by President Ruby for Alpa. O'Connell obtained from the Company copies of the March 15 agreements with the name of Alpa in all appropriate places and on the morning of March 29 asked President Ruby to execute them. Ruby asked that the agreements be left with him for study; O'Connell refused; Ruby did not sign.

On April 12, Allied sent out to all American pilots cards which if executed would authorize Allied to be the collective bargaining representative under the Act of the pilot so executing and on his behalf to ask for certification under Section 2, Ninth of the Act (45 U.S.C.A. § 152, Ninth).

On April 24, Allied filed with NMB an application, stating that a "representation dispute" had arisen among American pilots as to their representative under the Act and asking for an investigation and certification under Section 2, Ninth, of the Act. The "craft or class of employees involved" was said by Allied to be "pilots and co-pilots"; the total number of these was said to be 1600; and the total authorization cards submitted by Allied was said to be 1150.

At this point, the taking of evidence on these motions had been going on for some time, and at the opening of Court on April 25 an affidavit of O'Connell was submitted, setting forth the developments as to Allied and its application to NMB. Counsel for the additional defendants moved, or strongly suggested, that the motions of plaintiffs and intervenors were moot, but their counsel opposed. Argument on this point was heard, the proceedings temporarily adjourned, and the following day a memorandum decision was filed directing that the hearings resume on April 30 and proceed to completion.

An April 26, O'Connell and all other members of the American Negotiating Committee (except Miller, who had resigned February 18, 1963) were expelled from Alpa. The grounds for expulsion do not appear in this record but since there were pleas of guilty by the American pilots, it may be surmised that expulsion was for "failing to comply with a decision of * * * the Executive Board, the Executive Committee * * ", etc.

### 18. Recognition of Allied by the Company; Second Suggestion of Mootness

The hearings did resume on April 30 and were completed and the record closed on May 3; final briefs were received on May 27.

Apparently Alpa requested NMB to defer passing on the certification application of Allied until decision of the pending motions in this action. On May 24, NMB denied this request.

On June 12, the NMB mediator reported that 1571 pilots and co-pilots of American were eligible to vote for a collective bargaining representative and that Allied had been given authorization by 1334 of these, or in excess of 84%.

NMB then ordered an election to be held among American pilots and co-pilots to decide whether Alpa or Allied would represent the pilots. No such election has taken place, however, because of an action commenced by Alpa against NMB in the District of Columbia and because of orders made by the Court therein.

On June 19 and July 3, Allied demanded of the Company recognition as collective bargaining representative of all American pilots and co-pilots.

On July 9, the Company recognized Allied as such representative and on the same day signed certain collective bargaining agreements with Allied, effective July 9, 1963.

On July 11, an affidavit of Whitacre was filed in this action, setting forth the most recent developments above mentioned and supporting a suggestion, filed

on the same day by counsel for the Company, that the motions are now moot.

The suggestion of mootness by the Company as to the pending motions is based on (1) the recognition by the Company on July 9, 1963 of Allied as collective bargaining representative of the pilots, (2) the execution of collective bargaining agreements between Allied and the Company covering pilots and (3) the sending of a letter by the Company on July 11, 1963 to President Manning stating that the Company is "now prepared to resume bargaining" with the Chapter.

Copies of the July 9 agreements have been submitted by the Company. They differ significantly from the March 15 agreements because they do not cover, or purport to cover, or to affect in any way, the flight engineers; the December 1, 1962 crew complement agreement has not been executed.

## I.

It must first be determined whether, as urged by defendant and additional defendants, the present motions are now moot. Plaintiffs and intervenors insist that they are not.

As to the issues raised by Alpa, the Company says that any status which Alpa may have had at one time is now lost through the July 9 recognition of Allied; that Allied is not a party to this action; and that the execution of the new agreements is outside the scope of this action.

These may be arguments against the issuance of an injunction but they certainly do not show that all controversy has been eliminated and the motions become moot. The arguments do not really raise any issue of law as to mootness, because they do not meet the charges and grievances asserted by plaintiffs.

The organization of Allied, its recognition by the Company, and the execution of a collective bargaining agreement between Allied and the Company are not acts separate and independent from those on which plaintiffs base their claims. On the contrary, they follow from and are intimately related to the facts developed on these motions.

What Alpa argues is that there were violations of the Act and that the effects of these violations are continuing. Indeed, the Alpa argument is that the new facts on which the Company relies are themselves the result of the alleged illegal acts and that this Court has a duty under the Act to see that defendant does not enjoy these benefits of the alleged unlawful acts.

In the face of such arguments, it seems entirely clear that the motions of Alpa are not moot and must be decided on their merits.

But even if the matter were regarded as doubtful, it would seem the better course to decide the issues tendered by plaintiffs rather than to declare them moot. On any appeal, the matter would then be fully before a higher court rather than in fragments.

The intervenor flight engineers are in a different factual situation from Alpa. As to the engineers, the Company now declares (under date of July 11, 1963) that "[b]ecause of these developments" (namely, the execution of agreements with Allied, etc.), it is "now prepared to resume bargaining with AAL Chapter, FEIA." The Company further declares that, at its request, Allied "has given us assurances for the protection of flight engineers".

The Company says that the intervenors sought a Court order directing it to bargain with the Chapter; that it is ready to do so and has declared its readiness to the Chapter in writing; and that accordingly no Court order is needed and the motions of intervenors are moot.

The problem frequently arises whether an injunction should issue where the acts complained of have been discontinued during the litigation. See Diamond, Federal Jurisdiction to Decide Moot Cases, 94 U.Pa.L.Rev. 125, 137–146 (1946).

It is well settled that "the court's power to grant injunctive relief survives discontinuance of the illegal conduct". United States v. W. T. Grant

Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) As explained by the Supreme Court in the Grant case, this is because

> "A controversy may remain to be settled in such circumstances, * * e. g., a dispute over the legality of the challenged practices. * * * The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. * * For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right, * * *. The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement."

The burden on a defendant asserting mootness by discontinuance of illegal acts is "a heavy one" (345 U.S. at 633, 73 S.Ct. 894, 97 L.Ed. 1303). And in the Grant case, where refusal of an injunction was upheld as an exercise of discretion, the Supreme Court nevertheless concluded that "the actions were not moot" (345 U.S. at 635, 73 S.Ct. 894, 97 L.Ed. 1303).

■■ In the case at bar, the circumstances strongly suggest that the motions of intervenors should be decided on their merits. If it be assumed—as it must be for present purposes—that the engineers have established violations of the Act, then it would seem that they ought to receive a protective injunction even though the Company's attitude may have changed. No bad faith on the part of the Company need be even suggested in this connection. Its present attitude is accepted as genuine and sincere. But that attitude can change; and of course the individuals determining the Company's attitude themselves change as retirements, promotions and replacements occur. Moreover, there is no admission or recognition by the Company that its attitude toward the engineers has been wrongful. This is a factor also to be considered. United States v. Aluminum Co., 148 F.2d 416, 448 (2d Cir.

1945). The Company's changed attitude is not the result of a recognition of its duties as claimed by the engineers; rather the change is based on the recognition of Allied and its "assurances" respecting the engineers. If it be assumed that the engineers' claims on these motions are well founded, they should not be required to rely solely on "assurances" by Allied and on the dependent changed attitude of the Company.

And if the matter be doubtful, the same considerations as to a possible appeal are here present, as in the case of Alpa.

The suggestion that the motions are moot is therefore rejected.

## II

Once the facts have been analyzed and considered chronologically, the disposition of Alpa's motions is not difficult.

These motions ask in substance that a preliminary injunction issue directing the Company to bargain with Alpa as the "true representative" (300 U.S. at 548, 57 S.Ct. 592, 81 L.Ed. 789) of its pilot employees and restraining any bargaining as to pilots with any other group.

Whatever may have been the situation when the motions were made, since April 24, 1963, a proceeding has been pending before NMB to determine whether Alpa or Allied is the "true representative" of the pilots and NMB has ordered an election, on the basis of which NMB will certify the "true representative".

■ But whether NMB proceedings are pending or not, this Court is without power to find that Alpa is the "true representative" and entitled to the relief sought. The "administrative remedy" before NMB is "exclusive". General Committee of Adjustment of Broth. of Locomotive Engineers etc. v. Missouri-Kansas-Texas Ry. Co., 320 U.S. 323, 336, 64 S.Ct. 146, 88 L.Ed. 76 (1943). This principle has been recently recognized and followed in this Circuit where the dispute was over the "true representative" of flight engineers on an air line. Flight Engineers Intern. Assn, AFL-

CIO, EAL Chapter v. Eastern Air Lines, Inc., 2 Cir., 311 F.2d 745 (1963).

In the two cases cited, no proceedings to determine the "true representative" were in fact pending before NMB but it was held that Congress had "excluded" the Courts from this "field" (311 F.2d at 748).

In an interesting recent case having some parallel aspects, a railroad bargained with the national parent union and made an agreement. One of the local unions (part of the national organization) challenged the agreement as violative of the Act, asserting that the local was the "true representative" rather than the parent national union. The Courts were held to be without jurisdiction of the matter. Division No. 14, Order of Railroad Telegraphers v. Leighty, 298 F.2d 17 (4th Cir. 1962). It was said that such disputes ought to be resolved within the union but that "if these intraorganizational efforts are challenged, Board action [i. e., NMB], not judicial intervention is indicated" (298 F.2d at 21).

The argument for Alpa is that there are issues here beyond the identity of the representative; that there has been influence and coercion by the Company in the choice by pilots of their representative, in violation of the Act, specifically Section 2, Third and Fourth (45 U.S.C.A. § 152, Third and Fourth); that the Company assisted in the formation of Allied, in violation of Section 2, Fourth of the Act (45 U.S.C.A. § 152, Fourth); that the effects of these violations continue; and that the Company should be prevented by this Court from securing any benefit from the alleged violations. The logical consequence of such an argument is that the Court should disqualify Allied as a possible representative, even though it might have the support of a majority of the pilots. The Court, according to Alpa, has such jurisdiction "independent of the National Mediation Board".

Apparently Alpa would agree that NMB has exclusive jurisdiction where the issue is simply to decide which of two rivals has majority support. But where violations of the Act—influence, coercion, assistance—are alleged, Alpa argues that this Court has an independent jurisdiction. At least under the conditions here present, I cannot agree.

The existence and effect of unlawful influence, coercion and assistance seem inseparable from all other matters to be determined by NMB under Section 2, Ninth of the Act. After all, what Alpa is saying in effect is that because of influence, coercion and assistance by the Company, Allied (even though it might have majority support) cannot replace Alpa as the "true representative". This is the very question which Congress has committed to NMB, and not to the Courts.

Counsel for Alpa concede that where NMB acts under Section 2, Ninth, in a representation dispute, it deals with charges of unlawful interference, coercion and assistance. There is authority that the jurisdiction of NMB in these particular matters is exclusive. WES Chapter, Flight Engineers Intern. Ass'n AFL-CIO v. National Mediation Bd., 114 U.S.App.D.C. 229, 314 F.2d 234 (D.C. Cir.1962). An election was held by NMB to determine whether WES Chapter or SOA was the "true representative" of flight engineers; NMB certified SOA. An action was then commenced by WES Chapter to vacate the election and for injunctive relief. It was claimed (a) that eligible engineers had been excluded from voting and (b) that NMB had not investigated fully "the charge that SOA was dominated and assisted by the employer" (314 F.2d at 235). It was held that the Courts could not assume jurisdiction of such questions; as to domination and assistance it was said (314 F.2d at 237):

"The Association charged that SOA was assisted and dominated by the employer in violation of section 2, Third and Fourth, of the Act. The Board held a hearing on these charges, taking pertinent testimony but declining, because of lack of power,

to compel attendance of certain witnesses requested by the Association. The statute, in Section 2, Ninth, requires an 'investigation' of such disputes; and the Board, it seems to us, did investigate. In a different case, where, for example, a stronger showing is made initially by the charging party than was made here, the Board might be required to make a more independent investigation into a charge of company assistance to an opposing union seeking certification. But in discharging its duty to investigate in the manner it did in this case we find no official conduct in excess of authority and no refusal to bring the processes of the Board to bear in a reasonable manner on the dispute. Accordingly we do not think the District Court acquired jurisdiction to upset the Board's ruling that the Association's charges were without merit."

See also Order of Ry. Conductors of America v. National Mediation Board, 79 U.S.App.D.C. 1, 141 F.2d 366 (D.C. Cir. 1944).

The findings of fact already made would preclude granting the motions of Alpa in any event. There is no showing of influence or coercion on the part of the Company nor any unlawful assistance by the Company in the break away from Alpa and in the organization of Allied.

The Company had nothing to do with the creation of the dispute within Alpa, nor is there any evidence of any preference by the Company not to have Alpa. The single remark attributed to Whitacre in February 1963 does not affect this conclusion; it was insignificant in character and was not addressed to any pilots who might be affected thereby, but to flight engineers.

The fact that the Company continued to deal with the Negotiating Committee was not in my view any violation of the Act, considering that the Company acted in good faith, reasonably, without any practical alternative, and without any anti-union motivation.

Nothing in the two cases on which Alpa chiefly relies is to the contrary.

In Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) there was no question about who was the "true representative" of the employees. There had been an election and a certification by NMB (there has never been any certification of Alpa). The question was whether there was a "legally enforcible obligation" (300 U.S. at 541, 57 S.Ct. 592, 81 L.Ed. 789) under the Act to bargain with the "true representative"; the petitioner railroad also argued the unconstitutionality of the Act.

In Medo Photo Supply Corp. v. Labor Board, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944) the jurisdiction of the Court was not in doubt; the proceeding was on petition of the National Labor Relations Board to enforce its order requiring Medo to bargain with the union, etc. (29 U.S.C.A. § 160(e)). Moreover, the employer had induced the employees to leave the union by giving them a wage increase; here American displayed no interest in whether its employees left Alpa or not, certainly made no promises conditioned on their leaving Alpa or to induce them to leave Alpa, and at all times was willing to make agreements with Alpa if its own employees so desired. Also in the Medo case, the employer ceased and refused to deal with the union and instead dealt *directly* with the employees; here American continued to deal at all times with the same *representatives* of the employees, namely, the Negotiating Committee and the American MEC which finally caused the organization of Allied.

For the reasons set forth, the motions of Alpa must be denied.

### III

The application of Virginian Ry. Co. v. System Federation, above, to the facts as found requires that the Chapter, representing American flight engineers, be given relief by way of a temporary injunction.

There is no doubt whatever that the Chapter is now, and at all relevant times has been, the "true representative" under the Act of the "craft or class" of flight engineer employees of American. It was so certified by NMB on May 25, 1955. There has since that time never been the slightest evidence from which the Company could conclude that the Chapter no longer represented such employees. No one else now claims, or has ever claimed, to represent the flight engineers.

From at least as early as January 31, 1963 to July 11, 1963, the Company refused to bargain collectively with the Chapter, and until at least as late as March 15, 1963 the Company instead bargained collectively in respect of flight engineers only with a committee, of which O'Connell was Chairman, and which the Company claimed represented the flight engineers.

█ The situation seems to be exactly the same as in the Virginian Ry. case and in many later cases where the "command" of Congress expressed in the Act must "be enforced by the Courts" (300 U.S. at 545, 57 S.Ct. 592, 81 L.Ed. 789). The arguments by defendant and the additional defendants that the Norris-LaGuardia Act (29 U.S.C.A. § 101 and following) is applicable and prevents an injunction are without merit. They were rejected in the Virginian Ry. case where the Supreme Court declared that the provisions of the Railway Labor Act authorizing relief by injunction "cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act" (300 U.S. at 563, 57 S.Ct. 592, 81 L.Ed. 789). See also Brotherhood of Railroad Trainmen v. Chicago River and I. R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Order of R.R. Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960).

Whether mentioned specifically herein or not, the Court has given careful consideration to all arguments of the Company in opposition to the motions of intervenors.

█ The principal contention of defendant is that the Chapter is "estopped" because of its participation in joint negotiations and because of statements said to have been made by counsel and by President Manning on November 1, 1962, that the flight engineers were merged with the pilots and that there was a single craft or class. The difficulty is that the facts do not suppport such contention. The representations as claimed were never made by the engineers and, if they had been, the Company could not reasonably have relied on them; indeed, the Company did not rely on them. The situation was perfectly clear. From November 1, 1962 the parties were hopefully negotiating for a complete agreement which *if reached* would include merger of pilots and engineers on American into ·a single craft or class; as Whitacre testified, the negotiations were "subject to a complete agreement". Plainly, until that "complete agreement" was reached, there was no merger of pilots and engineers and no single craft or class.

The Company also urges that it made "substantial concessions" because of the conduct of the engineers and that the engineers have not lived up to "prior commitments". But these contentions do not square with the facts. The engineers have received no "concessions", substantial or otherwise. The Company—like the other parties—is bound to nothing which it promised or settled or discussed in the negotiations, this because everything was "subject to a complete agreement". The so-called "prior commitments" of the engineers are subject to the same infirmity; they were all "subject to a complete agreement" which never came about.

The Norris-LaGuardia Act has already been found to be inapplicable here. It should be noted, however, that the intervenors in any event and on this record are shown to have complied with "every obligation imposed by law" and to have made "every reasonable effort" to settle the dispute. If their efforts were frustrated, the Company has at least some re-

702

sponsibility because it failed to deal with the Chapter as the "true representative" of the flight engineers.

The intervenors are by their present motions in form asking for a preliminary injunction, as opposed to a final injunction after trial. But in fact there have been extensive hearings, the taking of much testimony and the reception of other evidence; it is difficult to see how a trial of the action would yield any significant further information. Under the circumstances, irreparable injury to intervenors may result unless a preliminary injunction issues at this time. The contract under which the flight engineers were employed from May 1, 1958, expired on April 30, 1963. A new contract must be negotiated. The damage to intervenors if a preliminary injunction were denied outweighs any foreseeable harm to defendant or to the additional defendants; indeed defendant stated in its July 11, 1963 letter that it was prepared to bargain with the Chapter.

The motions of intervenors are accordingly granted.

### IV

American has moved for an order under Fed.R.Civ.P. 53 referring to a master the question whether its "flight deck employees desire the Joint Negotiating Committee to continue to act as their bargaining representative". It is said that this determination is "relevant" to the Company's "defense". Whatever the merits or demerits of the motion may once have been, the passage of time and the disposition of the other motions have eliminated any necessity for such relief to the Company. The motion is accordingly denied.

The foregoing opinion sets forth the findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

Settle orders separately as to (a) the two motions of plaintiffs, (b) the two motions of intervenors, and (c) the motion of defendant. Suggestions are invited from counsel as to the amount of security to be required of intervenors under Fed.R.Civ.P. 65(c). Settlement of

the orders should be noticed for noon on Friday, August 16, 1963 or at any earlier time by which counsel for all parties will have completed submission of their papers.